**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------X

SARA RIVERS,          :
(formerly known as Sara Stokes)     :
        Plaintiff,   : Civil Case No.:   **25-cv-1726**
    v.         :
             :
             :   **COMPLAINT**
SEAN COMBS a/k/a "P. DIDDY, DIDDY, PUFF, PUFF :
DADDY, PUFFY, BROTHER LOVE", BAD BOY :
ENTERTAINMENT HOLDINGS, INC.,   :
HARVE PIERRE, TRACY WAPLES,    :
ALISON STANLEY, CHRIS SAINSBURY,   :
DEVYNE STEPHENS, NORMA AUGENBLICK,  :
DEREK WATKINS (a/k/a FONZWORTH BENTLEY), :   **JURY TRIAL DEMAND**
TONY DOFAT, MICKEY CARTER,    :
DERIC ANGELETTIE (a/k/a "D.Dot" and   :
"MADD RAPPER"), JASON WILEY,    :
BAD BOY ENTERTAINMENT LLC,    :
PHIL ROBINSON, SHAWN PEREZ,    :
DADDY'S HOUSE RECORDING STUDIOS,  :
BAD BOY PRODUCTIONS INC.,    :
COMBS ENTERPRISES, LLC,     :
UNIVERSAL MUSIC GROUP,     :
UNIVERSAL MUSIC & VIDEO DISTRIBUTION CORP.,:
JANICE COMBS, JANICE COMBS PUBLISHING INC., :
JANICE COMBS PUBLISHING HOLDINGS INC., :
SEAN JOHN CLOTHING LLC.,    :
PARAMOUNT GLOBAL, VIACOM,   :
MTV PRODUCTIONS,      :
JACKIE FRENCH, LOU PEARLMAN (estate of), :
BUNIM-MURRAY PRODUCTIONS,   :
TOWNSQUARE MEDIA GROUP,    :
JOHN AND JANE DOES 1-50, and    :
DOE ORGANIZATIONS 1-10     :
        Defendants.  :

-------------------------------------------------------------------------X

> <span style="color:red">**TRIGGER WARNING:**</span>
> <span style="color:red">**THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION.**</span>

   Plaintiff, SARA RIVERS  ("PLAINTIFF" or "PLAINTIFF SARA" or "SARA"), by and

through her attorneys, hereby alleges and avers of the Defendants, SEAN COMBS a/k/a "P.

DIDDY, DIDDY, PUFF, PUFF DADDY, PUFFY, BROTHER LOVE" ("DIDDY" or

"COMBS"), BAD BOY ENTERTAINMENT HOLDINGS, INC. ("BBE" or "BBEH"), HARVE

PIERRE ("HARVE"),  TRACY WAPLES ("TRACY"), ALSION STANLEY ("ALISON"),

CHRIS SAINSBURY ("CHRIS"), DEVYNE STEPHENS ("DEVYNE"), NORMA

AUGENBLICK ("NORMA"), DEREK WATKINS ("FONZWORTH"), TONY DOFAT

("DOFAT"), MICKEY CARTER ("MICKEY"), DERIC ANGELETTIE ("D.DOT"), JASON

WILEY ("JASON"), BAD BOY ENTERTAINMENT LLC ("BBE or "BBEL"), PHIL

ROBINSON ("PHIL"), SHAWN PEREZ ("SHAWN"), DADDY'S HOUSE RECORDING

STUDIOS ("DHRC"), BAD BOY PRODUCTIONS INC. ("BBP" or "Bad Boy Records"),

COMBS ENTERPRISES LLC ("CE"), UNIVERSAL MUSIC GROUP ("UMG"), UNIVERSAL

MUSIC & VIDEO DISTRIBUTION CORP. ("UMGD"), JANICE COMBS ("JANICE"),

JANICE COMBS PUBLISHING INC. ("JCP"), JANICE COMBS PUBLISHING HOLDINGS

INC. ("JCPH"), SEAN JOHN CLOTHING LLC ("SJC"), PARAMOUNT GLOBAL

("PARAMOUNT"), VIACOM ("VIACOM"), MTV PRODUCTIONS ("MTV"), JACKIE

FRENCH ("JACKIE"), LOU PEARLMAN ("LOU"), BUNIM-MURRAY PRODUCTIONS

("BM"), TOWNSQUARE MEDIA GROUP ("KING"), JOHN AND JANE DOES 1-50

("DOES") and ORGANIZATIONAL DOES 1-10  ("O-DOES") (collectively referred to as

"DEFENDANTS"), alleges upon information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT

1.  On November 16, 2023, Casandra Ventura a/k/a "Cassie" filed a 35-page lawsuit in

    which she exposed Defendant Combs of subjecting her to nearly a decade of physical,

    sexual and emotional abuse punctuated by rape, sex trafficking and being forced to

    engage in drug fueled nonconsensual sexual encounters with other men.

2. Ordinarily, when a lawsuit such as Ms. Ventura's is filed that involves events that took place long ago, witnesses are few and far between and evidence hard to muster. Not so for the claims brought against Defendant Combs. Within minutes of the filing Ms. Ventura's claims were confirmed by various witnesses, including a rival musician whose car Defendant Combs blew up, various individuals who observed Defendant Combs beat Ms. Ventura and a video released by CNN, showing Defendant Combs physically abusing, battering and assaulting Ms. Ventura.

3. Since Ms. Ventura's brave decision to file a lawsuit against Defendant Combs, Defendant Combs has accumulated numerous lawsuits across the country for the same conduct alleged by Ms. Ventura. The number is growing and continuous in various jurisdictions throughout the United States.

4. In September 2024, Defendant Combs was arrested in the Southern District of New York where he is currently being held with no bond while awaiting various serious criminal charges.[1]

5. Plaintiff now alleges she too is one of the many victims of Defendants Combs and the other Defendants named herein.

6. Plaintiff can support her allegations and has suffered extreme emotional distress impacting nearly every aspect of Plaintiff's life and personal relationships. Given all the brave individuals who have come forward against Defendant Combs, Plaintiff is also doing the same.

7. A complaint, similar to Plaintiff's herein, was filed by another Plaintiff who was part of a second installment of the television show titled "Making the Band" ("MTB") originally

---

[1] *United States v. Combs*, U.S.D.N.Y. 24-cr-542(AS)

3

produced by Bunim Murray then airing on MTV.[2] Much of the allegations Plaintiff made therein are similar in nature as Plaintiff in this matter. Plaintiff in this matter was pioneer of the MTB2 hip hop television show which originally aired October 19, 2002.

8. Plaintiff brings this action seeking injunctive, declaratory and monetary relief against Defendants in violation of the Victims of Gender-Motivated Violence Protection Law, Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL").

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over the Defendants under and consistent with the Constitutional requirements of Due Process in that the Defendants, acting directly or through his agents or apparent agents, committed one or more of the following:

    a. The transaction of any business within the state;

    b. The making of any contract within the state;

    c. The commission of a tortious act within this District; and

    d. The ownership, use, or possession of any real estate in this state.

10. As of the date of this filing, Defendants have consistently and purposefully availed themselves of the privilege of conducting activities within New York, thus invoking the benefits and protections of New York law. In return for these benefits and protections, Defendants must submit to the burdens of litigation in New York.

11. This litigation arises from or relates to the tortious activities the Defendants visited upon Plaintiff in New York. This tortious conduct violated United States Federal Rico Laws and other laws.

---

[2] *Richard v. Combs, et. al.,* New York Southern District Case No 1:24-cv-06848-KPF

12. Requiring Defendants to litigate these claims in this District does not offend traditional notions of fair play and substantial justice. Plaintiffs' claims arise from conduct occurring by Defendants in New York.

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 authorizing original jurisdiction over civil actions which arise under the Constitution, laws, or treaties of the United States. This Court has jurisdiction pursuant to 28 U.S.C. § 1343, as this action asserts violations of 18 U.S.C. § 1589 et seq., and 17 U.S.C. § 106 et seq., and therefore raises federal questions regarding the deprivation of Plaintiff's rights. This Court also has subject matter jurisdiction under 28 U.S. Code § 1331 and supplemental jurisdiction under 28 U.S. Code § 1367 because the state law and city law claims form part of the same case and controversy as the claim arising under the federal statute.

14. Pursuant to 28 U.S.C. § 1391(b), (c) and 1400(a), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, alleged herein, occurred in this district and multiple Defendants including Defendants Sean Combs and Bad Boy Records, Sean John, etc.  conduct substantial business and/or are domiciled in this District.

15. Plaintiff brings suit against Defendants pursuant to the NYC Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 8-901 *et. seq*, to redress the substantial and lifetime injuries she has suffered.

16. This Court has personal jurisdiction over Defendants and each of them because Defendants have purposefully directed their unlawful conduct to this judicial district and have conducted substantial business in this judicial district.

## **PROCEDURAL REQUIREMENTS**

**THE N.Y.C. VICTIMS OF GENDER MOTIVATED VIOLENCE PROTECTION ACT**

17. The N.Y.C. Victims of Gender Motivated Violence Protection Act ("NYC Gender Motivated Violence Act") created a lookback window on March 01, 2023, which runs for two years, for survivors of gender motivated violence, allowing them to sue their abusers regardless of when the abuse occurred. N.Y.C. Admin. Code § 10-1105(a).

18. The NYC Gender Motivated Violence Act revives any claims against "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

19. The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

20. The conduct of Defendants in battering and assaulting Plaintiff constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as well as specifically at Defendant Combs direction, enabling, participation and conspiring in the commission of a crime of violence motivated by gender as defined by the NYC Gender Motivated Violence Act.

21. Given the extensive media coverage of the criminal trial brought by the Southern District of New York and numerous civil lawsuits filed in both Federal and State against Defendant Combs, Defendants were put on notice of the multiple allegations made against Defendant Combs including drug trafficking, sex trafficking and racketeering.

## **PARTIES**

### **PLAINTIFF SARA RIVERS**



22. Ms. Sara Rivers is a resident of the State of Michigan and was employed by Defendants Bad Boy Entertainment LLC, Bad Boy Records LLC, Bad Boy Entertainment Holdings LLC, Bad Boy Productions Holdings Inc., Combs Enterprises LLC, Sean John Clothing, Janice Combs Publishing (hereinafter collectively "Bad Boy Records"), Universal Music Group, Paramount, Viacom, MTV and Bunim Murray from 2002 until 2004. At all relevant times herein, Plaintiff met the definition of an "employee" of Defendant Bad Boy and related entities and Defendant Paramount and related entities. At all relevant times herein, Plaintiff was a resident of the State of Michigan.

**DEFENDANT SEAN COMBS a/k/a "Diddy"**

 

23. Defendant Diddy is currently an inmate Metropolitan Detention Center in Brooklyn, NY. Defendant Diddy maintains residences in California and Florida and is believed to be a resident of the State of California. At all relevant times to the occurrences herein, Defendant Diddy was a citizen and resident of the State of New York.

24. Defendant Diddy is a rapper and record executive popularly known by his stage names Puff Daddy, Puffy, Puff, P. Diddy, Diddy, Brother Love or Love. Defendant Diddy rose to prominence in the music and entertainment industry over the decades and is regularly referred to as a hip-hop mogul. Defendant Diddy was first accused of acts described in this complaint by his long-time paramour and former BBE artist, Cassie Ventura, on November 16, 2023.

25. Defendant Diddy is a Grammy-awarded musician, rapper and producer.

26. Defendant Diddy founded Defendants BBE, BBR, BBP, BBBK, and SJC .

27. Defendant Diddy participated in three separate installments of the television show Making the Band 2, 3 and 4, produced by Defendant BM and airing on Defendant MTV's network, for a total of nine season and approximately 101 episodes.

28. In 2022, Forbes estimated that Defendant Diddy is one of the wealthiest hip-hop artists in America and that his net worth is over $1 billion.

29. Upon information and belief, Defendant Diddy has a long history of committing physical and sexual violence against women and men, similarly alleged in this complaint, as documented in publicly available in nine lawsuits across the country and extensive media coverage.

## DEFENDANT BAD BOY ENTERTAINMENT HOLDINGS, INC.



30. Defendant Bad Boy Entertainment Holdings, Inc., is a domestic business corporation license to do business in New York and  incorporated and headquartered in New York, New York.

31. Defendant Bad Boy Entertainment Holdings, Inc. is a domestic business corporation licensed to do business in New York since 1992.

32. Upon information and belief, Defendant Bad Boy Entertainment Holdings Inc. is a successor-in- interest to Defendants Bad Boy Entertainment LLC, Bad Boy Records LLC, and Bad Boy Entertainment Inc. as alleged herein.

33. Defendant BBE has been named in several lawsuits with Defendant Diddy.

## DEFENDANT HARVE PIERRE

 

34. Defendant Harve Pierre ("Defendant Harve"), upon information and belief, resides within and is domiciled in the state of New Jersey. At all times relevant herein, Defendant Harve was the president of Bad Boy Entertainment and Bad Boy Records in New York and met the definition of an "employer" of Plaintiff under all relevant statutes.

35. According to Defendant's LinkedIn profile Defendant has not worked for Defendants Diddy, BBE or any other enterprise founded by Defendant Combs since 2017.[3]

**DEFENDANT TRACY WAPLES**



36. Defendant Tracy Waples ("Defendant Tracy"), upon information and belief, resides and is domiciled within the state of New Jersey. At all times relevant herein, Defendant Tracy was either the Vice President of Marketing at Bad Boy Entertainment and Bad Boy

---

[3] https://www.linkedin.com/in/harve-pierre/

Records in New York or General Manager at Bad Boy Entertainment and Bad Boy Records in New York.[4]

**DEFENDANT ALISON STANLEY**

 

37. Defendant Alison Stanley ("Defendant Alison"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Alison was either the Boot Camp Instructor at Bad Boy Entertainment and Bad Boy Records in New York, Product Manager at Bad Boy Entertainment and Bad Boy Records in New York or Marketing Director and Artist Manager at Bad Boy Entertainment and Bad Boy Records in New York.[5]

**DEFENDANT CHRIS SAINSBURY**



---

[4] https://www.linkedin.com/in/tracey-waples-5b1625196/
[5] https://www.linkedin.com/in/alison-stanley-a99a207/

38. Defendant Chris Sainsbury ("Defendant Chris"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Chris was the Physical Trainer at Bad Boy Entertainment and Bad Boy Records in New York, in charge of Artist Development and Corporate Wellness.[6]

### DEFENDANT DEVYNE STEPHENS



39. Defendant Devyne Stephens ("Defendant Devyne"), upon information and belief, resides and is domiciled within the state of Georgia.[7] At all times relevant herein, Defendant Devyne was the official dance choreographer at Bad Boy Entertainment and Bad Boy Records in New York.

### DEFENDANT NORMA AUGENBLICK

   

---

[6] https://www.linkedin.com/in/christophersainsbury/details/experience/
[7] https://www.devynestephens.com/biography

40. Defendant Norma Augenblick ("Defendant Norma"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Norma was the executive assistant to Defendant Diddy at Bad Boy Entertainment and Bad Boy Records in New York.

**DEFENDANT FONZWORTH BENTLEY**

 

41. Defendant Fonzworth Bentley ("Defendant Fonzworth"), upon information and belief, resides and is domiciled within the state of Georgia. At all times relevant herein, Defendant Fonzworth was the chief assistant and consigliere to Defendant Diddy at Bad Boy Entertainment and Bad Boy Records in New York and "tour manager" for Plaintiff and her group at Bad Boy Entertainment and Bad Boy Records in New York.

**DEFENDANT TONY DOFAT**



42. Defendant Tony Dofat ("Defendant Dofat"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Dofat was a music and record Producer at Bad Boy Entertainment and Bad Boy Records in New York. Defendant Dofat got his start in music from Defendant Combs.

**DEFENDANT MICKEY CARTER**



43. Defendant Mickey Carter ("Defendant Mickey"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant

Mickey was representing himself as a lawyer. Defendant Mickey appeared on MTB2 as a lawyer on behalf Plaintiff and her group.

44. Defendant Mickey was an agent sent by Bad Boy Entertainment and Bad Boy Records in New York.

45. Defendant Mickey is currently an Executive Vice President for Defendant Viacom.[8]

46. Upon information and belief, Defendant Mickey, after a diligent search, does not appear to be an attorney of record in any jurisdiction, especially not the State of New York.

47. Upon information and belief, Defendant Mickey, after a diligent search, does not appear to have graduated from law school, especially not the one indicated on his LinkedIn profile.

48. Upon information and belief, Defendant Mickey, after a diligent search, does not appear to have served in the military, unlike indicated on his LinkedIn profile and various posts by Defendant Paramount Veterans social media page.

49. Defendant Mickey has noticeably absent work history during the period Defendant was pretending on national television he was Plaintiff and her group member's lawyer.

### DEFENDANT "D.DOT"/"MADD RAPPER"



---

[8] https://www.linkedin.com/in/mickeycarter/

50. Defendant D.Dot ("Defendant "D.Dot"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant D.Dot was an A&R executive at Bad Boy Entertainment and Bad Boy Records in New York.

**DEFENDANT JASON WILEY**



51. Defendant Jason Wiley ("Defendant Jason"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Jason was the Director of Marketing at Bad Boy Entertainment and Bad Boy Records in New York[9] and "tour manager" for Plaintiff and her group at Bad Boy Entertainment and Bad Boy Records in New York.

---

[9] https://www.linkedin.com/in/jason-wiley555/details/experience/

**DEFENDANT BAD BOY ENTERTAINMENT LLC**

52. Defendant Bad Boy Entertainment LLC is a music, media, and entertainment company founded by Defendant Sean Combs, which includes the record label Defendant Bad Boy Records LLC. Defendant Bad Boy Entertainment LLC is a Delaware limited liability company and successor-in-interest to RPI. At all relevant times herein, Bad Boy Entertainment LLC met the definition of an "employer" of Ms. Richard under all relevant statutes.

**DEFENDANT PHIL ROBINSON**



53. Defendant Phil Robinson ("Defendant Phil"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Phil was a Music Executive at Bad Boy Entertainment and Bad Boy Records in New York and served as "manager" to Defendant Diddy and Plaintiff and her group at Bad Boy Entertainment and Bad Boy Records in New York.

**DEFENDANT SHAWN PEREZ**



54. Defendant Shawn Perez ("Defendant Shawn"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Shawn was Director of Promotion at Bad Boy Entertainment and Bad Boy Records in New York.

### DEFENDANT DADDY'S HOUSE RECORDING STUDIO

55. Upon information and belief, Defendant Daddy's House Recording Studio Inc. is a New York corporation and a music recording studio owned by Defendant Bad Boy Records, in New York. At all relevant times herein, Plaintiff was an employee required to work at said studio.

### DEFENDANT BAD BOY PRODUCTIONS

56. Defendant Bad Boy Productions Holdings Inc. is a New York corporation. Upon information and belief, Defendant Bad Boy Production Holdings Inc. is a successor-in-interest to other "Bad Boy" Defendants as alleged herein.

### DEFENDANT COMBS ENTERPRISES

57. Combs Enterprises LLC are New York limited liability companies, which upon information and belief are successor-in-interest companies to Defendant The Sean Comb Music, Inc.

## DEFENDANT UNIVERSAL MUSIC GROUP



58. Defendant Universal Music Group N.V. ("UMG") is a Dutch American multinational music corporation that also includes Defendant UMG Distribution. UMG's corporate headquarters are located in Hilversum, Netherlands and its operational headquarters are located in Santa Monica, California. At all relevant times herein, UMG and subsidiaries financially benefited from, condoned and enabled Defendant Combs' misconduct as defined under all relevant statutes.

## DEFENDANT JANICE COMBS




59. Defendant Janice Combs ("Defendant Janice"), upon information and belief, resides and is domiciled within the state of Florida. At all times relevant herein, Defendant Janice was an integral part of the business dealings at her son, Defendant Diddy's, at Bad Boy Entertainment and Bad Boy Records in New York.

**DEFENDANT JANICE COMBS PUBLISHING**

60. Defendant Janice Combs Publishing Inc. ("Defendant JCP"), is a music publishing administrator and a New York corporation, who at all relevant times, held or holds the publishing copyrights of Plaintiff pursuant to her employment with other Defendants herein under all relevant statutes.

**DEFENDANT JANICE COMBS PUBLISHING HOLDINGS**

61. Defendant Janice Combs Publishing Holdings Inc. ("Defendant JCHP"), is a music publishing administrator, a New York corporation, and a successor in interest to Janice Combs Publishing Inc., who at all relevant times, held or holds the publishing copyrights of Plaintiff's pursuant to her employment with other defendants herein under all relevant statutes.

**DEFENDANT SEAN JOHN CLOTHING, LLC.**

62. In 1998, Combs founded Sean John, ("Defendant SJC"),  which has retail sales of over $450 million and is a New York Corporation.

63. As CEO and president of the company, Defendant Combs was representing Sean John when he injured Plaintiff.

## DEFENDANT PARAMOUNT GLOBAL



64. Defendant Paramount Global ("Defendant Paramount") is an American multinational mass media and entertainment conglomerate corporation controlled by National Amusements. Paramount's corporate headquarters are located in New York. At all relevant times herein, Paramount and subsidiaries, like Defendant MTV, financially benefited from, condoned and enabled Defendant Combs' misconduct as defined under all relevant statutes.

## DEFENDANT VIACOM



65. Defendant Viacom ("Viacom") was an American media corporation focused on film and television. Viacom's corporate headquarters are located in New York. At all relevant times herein, Viacom and its subsidiaries financially benefited from, condoned and enabled Defendant Combs' misconduct as defined under all relevant statutes. Viacom was split into two companies in 2005, and Paramount Global is now its successor.

**DEFENDANT MTV**



66. Defendant MTV ("Defendant MTV") is an American media corporation MTV's corporate headquarters are located in New York. At all relevant times herein, MTV and its subsidiaries financially benefited from, condoned and enabled Defendant Combs' misconduct as defined under all relevant statutes. Defendant MTV is owned by Defendant Paramount Global.

**DEFENDANT JACKIE FRENCH**

 

22

67. Defendant Jackie French ("Defendant Jackie"), upon information and belief, resides and is domiciled within the state of New York. At all times relevant herein, Defendant Jackie was Director of Original Series at MTV's network in  New York. [10]

**DEFENDANT LOU PEARLMAN**



68. Defendant Lou Pearlman ("Defendant Lou"), upon information and belief, is deceased but was domiciled within the state of New York. Defendant Lou created the Original Series "Making the Band" with Defendants Bunim-Murray for Defendant MTV's network in New York.

**DEFENDANT BUNIM MURRAY**



---

[10] https://www.linkedin.com/in/jackie-french-629492a1/details/experience/

69. Defendant Bunim Murray ("Defendant BM") is an American media production company headquartered in California and owned by French Company Banijay Entertainment since 2010. At all relevant times herein, Defendant BM and its subsidiaries financially benefited from, condoned and enabled Defendant Diddy's misconduct as defined under all relevant statutes.

## DEFENDANT TOWNSQUARE MEDIA GROUP



70. Defendant Townsquare Media ("Defendant King") is an American a media company that owns radio stations, websites, and digital marketing services headquartered in New York. At all relevant times herein, Defendant and its subsidiaries financially benefited from, condoned and enabled Defendant Diddy's misconduct as defined under all relevant statutes.

## DEFENDANT DOES

68. Upon information and belief, Plaintiff alleges that Defendant Does are other parties not yet identified who have violated Plaintiff by assaulting, battering and threatening her, conspired, and/or aided and abetted the Defendant Diddy and the other Defendants in their participation in a corrupt organization that caused Plaintiff's injuries. The true names, whether corporate, individual or otherwise, of Defendants, are presently unknown

to Plaintiff, which therefore sues said Defendants by such fictitious names, and will seek

leave to amend this Complaint to show their true names and capacities when same have

been ascertained, pursuant to CPLR §1024.

69. Upon information and belief, Plaintiff believes some or all of the Defendant Does 1-10

are citizens of the State of New York.

70. Upon information and belief, Plaintiff believes and thereon alleges that at all times

relevant hereto each of the Defendant l Does 1-10 were the agent, affiliate, officer,

director, manager, principal, alter-ego, and/or employee of Defendants.

71. The limitations Article 16 of the CPLR do not apply because one or more of the

exceptions set forth in CPLR §1601 and/or §1602 apply.

## FACTUAL ALLEGATIONS

**Plaintiff is Selected From Open Call Audition's to be a Semi-Finalist in the Inaugural "Hip-Hop" Edition Of Making The Band.**

72. The television show entitled Making The Band "MTB" originally aired on ABC on

March 24, 2000, for three seasons ending on March 30, 2002.

73. MTB was created by Defendant Lou and the founders of Defendant BM, Mary-Ellis

Bunim and Jonathan Murray.

74. The group that was "made" during this inaugural season was boy band and pop group

"O-Town."

75. The "O-Town" season is referred to as MTB1.

76. The group "O-Town" was assembled by Defendant Lou.

77. Defendant Lou is also responsible for the boy band super groups Backstreet Boys and

*NSYNC.

25

78. Upon information and belief, Defendants Lou, BM and MTV decided the next season of MTB it would form a "hip-hop group."

79. Defendants Lou, BM and MTV then enlisted Defendant Diddy to find a group from an open casting and have it filmed, produced and aired on television referred to as MTB2.

80. Plaintiff, while in Atlanta pursuing her already blossoming music career, received a call alerting her to an open casting call for a music group by Defendant Diddy.

81. Plaintiff immediately returned home to Detroit to audition for the potential group.

82. Plaintiff was the seventh person to be seen out of the thousands of people who appeared to have a chance at music stardom with Defendants MTV, Bad Boy and Diddy.

83. Plaintiff was selected as a semi-finalist and was told that the next steps would be to come to New York to continue the audition process, be evaluated by Defendant Diddy and ultimately have an opportunity to be a member in the group being formed on the new season of MTB called MTB2.

What follows is all a sequence of events that were documented by Defendant BM and aired on Defendant MTV's Network between October 19, 2002- April 20, 2004. It is important note Plaintiff was never compensated for her participation on MTB2.

### MTB2 Season 1 Episode 1- OPEN CALL/ INITIAL TALENT SEARCH [11]

84. First episode describes the show as the second installment, but this time looking to form a hip-hop group called MTB2.

85. In this episode we meet Plaintiff.

---

[11]  Air Date October 19, 2002
https://www.youtube.com/watch?v=ma1cOJrAV10&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=2

86. Defendant Harve explains Defendant MTV held auditions for candidates in Detroit, Miami, New York City, Atlanta, Los Angeles and DC/Baltimore to be members of the new hip-hop group formed by Defendant Diddy on MTB2.

87. Defendant Diddy meets with an unidentified executive, John Doe 1 who is never named while appearing on the show presumably an employee of Defendant MTV, regarding the next steps for the semi-finalist from the open auditions of MTB2.



88. Also at this meeting is Defendant Phil, a long-time friend and business executive working for Defendant Diddy and his enterprises.

89. During this meeting about MTB2, Defendant Diddy takes a call from his son.

90. Defendant MTV transports, through various Doe common carriers, all the semi-finalist to NYC to meet with Defendant Diddy for further consideration to be part of the group.

91. Defendant Diddy conducts auditions with the semi-finalist.

**MTB2 Season 1 Episode 2- SEARCH FOR MORE TALENT** [12]

92. In this episode, celebrity cameos are made by Andre Harrell and Russell Simmons.

93. Defendant Diddy meets with Defendants MTV and BM to brainstorm ideas to promote casting.

---

[12] Air Date October 26, 2002
https://www.youtube.com/watch?v=WBwAVByC4f4&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=2

94. Defendant Diddy complains to Defendant MTV that he doesn't feel like he has the talent from the current group of semi-finalist to make a group and Defendant MTV has have to "be involved" with acquiring the talent so that Defendant Diddy can form the group.

95. Defendant Diddy complains to Defendant MTV that he feels "bamboozled" by Defendant MTV into thinking this was "something hot" when it was not even good enough to "make it into [his] office."

96. Defendant Diddy complains to Defendant MTV that he doesn't feel like they are doing what they need to do to help him promote this endeavor.

97. Defendant Diddy then makes an analogy to describe the type of promotion he wanted from Defendant MTV regarding the MTB2 production, "when Puff on trial what happens in the trial the whole world knows about it… a Puffy trial is special."

98. Defendant Diddy went on to say since MTB was positive he deserved the same attention/press as his trial coverage.

99. Defendant Diddy complains to Defendant Jackie that he "needs kids on MTV to see it," "so everybody could get excited," and that Defendant Diddy would not stop until he has seen "everybody/everywhere."

100.    Defendant Diddy then makes an analogy about not choosing a woman to leave the club with at 10 pm versus at the height of the night at 1:30 am, in an effort to explain why he would not stop until he has seen "everybody/everywhere." Defendant Diddy went so far as to say he would wait as late as 3 am to decide on what woman to leave the club with to emphasize his serious on his commitment to seeing "everybody/everywhere."

101.    Defendant Diddy then offers the idea of a one-day New York City only talent search.

102.    Defendant Diddy advises anyone who wants a "chance at stardom to holla at us."

103.    Defendant Diddy states that he is very particular about choosing the members of this group because he is "not going to put his name on anything not filling a void in the marketplace."

104.    As a result to a seeming commitment to excellence, Defendant Diddy sends the semi-finalist home.

105.    During the scene when the contestants are told they are being sent home, you can see the contestants' signing documents. (Plaintiff believes were contracts with Defendants BM, MTV, Viacom and Paramount.)

106.    Defendant Diddy scolds the contestant's behavior to members of his staff, and staff of Defendants BM and MTV saying they were "pampered" because Defendants BM and MTV "bought them plane tickets" and "put them in hotels."

107.    The episode ends with celebrity appearances from rappers Loon and Foxy Brown.

**MTB2 Season 1 Episode 3- SEMI-FINALIST SELECTED** [13]

108.    A 48-hour New York City audition process begins as demanded by Defendant Diddy.

109.    Approximately 3,000 people show up for the first day of open auditions.

110.    Defendant Diddy, meanwhile, is getting ready for his performance on Defendant MTV's award show called the Video Music Awards "VMAs." Defendant Diddy calls MTV executive Elli Cola. Cola and Defendant Diddy discuss Defendant Diddy's demand for more time to perform at the VMAs. Defendant Diddy's request is ultimately granted.

---

[13] Air Date November 2, 2002
https://www.youtube.com/watch?v=ANV6rzVafxg&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=3

111.    Defendant Diddy chooses fifteen of the original semi-finalist to return to New

York to continue consideration for the group.

112.    Contestants, including Plaintiff, are placed in a hotel and share their hotel room

with a roommate.

113.    Semi-finalists are then transported from the hotel to a location where they

audition for Defendant Diddy so he can select the candidates for "Bad Boy Boot Camp."

114.    During this episode Defendant Diddy provides insight on what he is looking for in

group members stating, "A lot of times some of the biggest superstars haven't had the

most talent... or haven't had the most vocal ability… haven't been perfect package" and

that "talent is just the icing on the cake."

115.    While waiting on selection, a candidate complains about the lack of receiving

food. This same candidate is scolded by Defendant Tracy, who makes her first

appearance as Vice President of Marketing for Defendant BBE.

116.    Defendant Tracy admonishes the contestant for complaining about not being fed

and told the contestant she needed to be "humble" somehow indicating that the desire to

eat lacked humility.

117.    Defendant Diddy was told about the contestant's food comment which Defendant

Diddy responded by immediately eliminating that contestant from consideration in the

group.

118.    Defendant Diddy exposes his intent with the group members stating he was

"literally going to try to break [them]."

119.     Defendant Diddy explains his desire to break the contestants because he says it's
what the music industry "tries to do to us every day" and complains about how being in
the music industry is "one of the hardest jobs to have."

120.     Defendant Diddy then further advises that people should neber let "anyone
interrupt you from your dreams."

121.     Defendant Diddy then selects the contestants for Bad Boy Boot Camp, which
Plaintiff is selected.

**MTB2 Season 1 Episode 4- BOOT CAMP [14]**

122.     In this episode we are introduced to another executive for Defendants Diddy and
BBE, Defendant Alison Stanley.

123.     Plaintiff, and the contestants in the Bad Boy Boot Camp, are transported from the
Belvedere Hotel and taken to a park to work out with a personal trainer employed by
Defendant BBE, Defendant Chris.

124.     Defendant Diddy makes another statement about his intent to "break some of
them in an hour," or make them have a "nervous breakdown" and/or make them "pass
out, become unhealthy and quit."

125.     Defendant Devyne, another employee and agent of Defendants Diddy and BBE, is
sent to work with the female singers only on dance moves and choreography, this
includes Plaintiff.

126.     Defendant Diddy arrives at the dance studio to watch the women dance for him.

---

[14] Air Date November 9, 2002
https://www.youtube.com/watch?v=Lq1G5o54cmA&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=4

127.    Plaintiff is required to dance individually for Defendant Diddy, Devyne, Alison, and various other employees of Defendants MTV, BM and BBE. Plaintiff was considered as one of the better dances.

128.    It is important to note the male singer nor any of the male rappers, or female rappers were forced to endure choreography and evaluations by Defendant Diddy.

129.    Contestants are then brought to Defendant BBE's offices for media training where a brief argument ensues.

130.    Defendant Norma, an executive assistant to Defendant Diddy, admonishes the contestants telling them that the BBE offices are "a place of business where they don't argue and fight here. So if there's a problem, they should leave."

131.    The episode ends with a contestant being taken to the hospital by ambulance due to overexertion from the everyday morning workouts.

**MTB2 Season 1 Episode 5 - FINALIST SELECTED** [15]

132.    Plaintiff discusses her family, comprised of her three young children and husband.

133.    Defendant Diddy watches a video of Plaintiff saying she believed him to be one of the "smartest people she's ever met, a genius." While Defendant Diddy stands proudly next to the tv displaying Plaintiff making these statements.

134.    Defendant Diddy discusses how this season of MTB is different saying it was "not O-Town cats but something different."

---

[15] Air Date November 16, 2002
https://www.youtube.com/watch?v=Jv8T_zaH5wQ&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=5

135.    Defendant Diddy arranges for contestants to have a showcase at his restaurant Justin, named after his son. The showcase will determine the individuals who get to move on in the process and move into the house.

136.    Thirty contestants perform for Defendant Diddy at this showcase to be one of the twelve individuals selected to move into the house for further consideration of the group.

137.    Defendant Diddy then again warns the contestants that "if you make in in the house, I will try to break you day one."

138.    Defendant Diddy, seemingly aware of his outrageous conduct, states that he wasn't trying to make the process of being in the group "overdramatic or tougher than what it is" but that it "aint a cake walk." [16]

139.    Plaintiff is called as the first contestant to make it to the next round and move into the house.

**MTB2 Season 1 Episode 6 – FIRST ELIMINATION** [17]

140.    Defendant Diddy refers to Defendants Alison and Tracy as his "eyes and ears."

141.    Defendant Tracy informs the contestants to be prepared for "spontaneous house checks, room cheks, at all hours of the night or morning" and any failures "will be penalized."

142.    Contestants are taken to work out again where Plaintiff is the first to complete the two-mile run.

---

[16] See Season 2 Episode 1
[17] Air Date November 23, 2002
https://www.youtube.com/watch?v=SCmFYKX2cp4&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=6

143.    There is an altercation between two contestants one a white male rapper and the other a black female rapper. The female rapper calls the white male rapper a "white devil" which makes the white male rapper cry.

144.    When Defendant Diddy is told of the incident the next day, he makes fun of the white male rapper crying and tells his staff the white male rapper should see what it's like to "be a black man for the day."

**MTB2 Season 1 Episode 7 – DRAMA WITH CONTESTANTS PT. 1** [18]

145.    This is the first episode that includes a theme song at the introduction of the show. The theme song is composed and performed by various contestants on the show.

146.    Several fights break out during this episode between multiple male contestants. One such indecent solicited police involvement where Plaintiff was questioned about the individuals and her perspective on the physical altercation.

147.    Defendant Tracy informs the individuals who were fighting that this "show is not about fighting." Defendant goes on to say the "show about promoting positivity as far as giving people a chance to make it."[19]

148.    Defendant Diddy shows up to the contestant's workout to discuss the fights.

149.    Defendant Diddy tells the contestants that he was hoping someone would "make his job easier" and "go home."

150.    Despite this plea for someone to make Defendant Diddy's life easier and go home, when one of the contestants packs up and tries to leave after another altercation

---

[18] Air Date November 30, 2002
https://www.youtube.com/watch?v=Nez8KZZ06wg&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=7
[19] See Season 3 Ep 4

Defendant Alison does everything in her power to convince that contestant to stay including forcing the contestant to call Defendant Harve.

### MTB2 Season 1 Episode 8 - DRAMA WITH CONTESTANTS PT. 2 [20]

151.    During this episode several contestants find out they have various issues that may prevent them from further moving on in consideration for the group including pregnancy and legal issues.

152.    Defendant Diddy discusses these issues with the contestants reassuring them their issues wouldn't preclude them from further consideration and participation.

153.    Plaintiff is seen stating she "wants this," it's her "dream" and nothing was going to hold her back from "accomplishing [her] goal."

154.    Defendant Harve states what he believes Defendants Diddy and BBE are seeking in group members. Defendant says they are "not looking for drop dead talent" but are looking for "kids we can see maturing through this process."

155.    Defendant Diddy comes to house to make eliminations. Defendant Diddy eliminates the white male rapper he previously mocked for crying, the pregnant female who he assured her pregnancy wouldn't be a barrier to her continued participation and the contestant with legal issues he also told wouldn't be a barrier to his continued participation.

### MTB2 Season 1 Episode 9- SCAVENGER HUNT [21]

---

[20] Air Date December 7, 2002
https://www.youtube.com/watch?v=uWZ6zRdaPY0&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=8
[21] Air date December 16, 2002
https://www.youtube.com/watch?v=7dCMQXLbhpg&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=9

156.     Defendant Alison sends the contestants on a Bad Boy scavenger hunt that leads to

a tie. The tie breaker is won by the person who was able to quote Defendant Diddy's

phrase that was painted on the wall of the contestant's home, verbatim.

157.     The quote is "life is not a game. Only the fittest and most aggressive survive.

Sleeping is forbidden. A second cannot be wasted. Once seconds are lost you lose and

losing is for losers."

158.     Defendant Diddy comes into the contestants' home and makes the contestants

engage in an impromptu rap off.

### MTB2 Season 1 Episode 10- FINALE [22]

159.     Plaintiff admits to cameras that she "never knows what [Diddy] wants."

160.     Defendant Diddy splits remaining twelve into three groups of four to make a

song.

161.     Defendant Diddy states it's a "method to [his] madness" and he is "not trying to

be mean" or "extra hard" on the contestants but his intent is to "prepare them for the war

zone they have to go out in." The war zone he is seemingly describing is the music

industry.

162.     Plaintiff sings in the background during various transitions in episode.

163.     Defendant Diddy then invites one of the contestants to battle rap another rapper

on Defendant's label.

---

[22] Air date December 21, 2002
https://www.youtube.com/watch?v=3AZ9HMlZU_g&list=PLuqn7OKjCWdv2oHzmPXlERsW_ZbovjP8X&index=10

164.     Defendant Diddy then asks Defendant MTV to "cut the cameras" so additional rounds of the battle rap can go on uncut and undocumented. It seems that Defendant MTV acquiesced to Defendant Diddy's request.

165.     Defendant Diddy then returns to contestants in the studio telling them they won't have as much time as they would usually have to make a record because he wants to make them the "definition of a new era of Bad Boy artist who are extremely focused, extremely dedicated, extremely passionate and always prepared." So as a result, Defendant Diddy only gives each group thirty minutes to record their group's song in the studio, Defendant Daddy's House.

166.     Plaintiff group performs first where she shocks Defendant Diddy with her powerful singing voice.

167.     After all the groups record, Defendant Diddy advises the contestants that if they are not pick and they cry to "cry all the way hard, don't cry in between, spazz out, jump out of window, go to hospital, threaten to hold the entire house hostage, just NO WIMPERING."

168.     Defendant Diddy then takes four of the contestants, randomly selected, with him to a taping of TRL (Total Request Live), another show on Defendant MTV's network, on October 18, 2002.

169.     Defendant Diddy then has a meeting with Defendant MTV and various employees of Defendant BBE to decide who will make the group.

170.     Defendant Diddy evaluates Plaintiff stating he is concerned about Plaintiff because she "can't handle making mistakes." Defendant akin Plaintiff to a "samurai

warrior" who if she felt like she did not do well she would impale herself with a sword to the stomach for failing.

171.    Defendant Diddy then evaluates Plaintiff's direct competition saying she was easy to work with and that in deciding about who to put in a group Defendant considers who is going to be "easier to work with."

172.    Defendant Diddy takes the advice of his employees, agents and other Defendants but ultimately says he is the "President of the United States of Bad Boy" and that he "calls all the shots."

173.    Defendant Diddy then picks the members of the group, calling Plaintiff's name third out of six.

174.    Plaintiff, after finding out she made the group, excitedly calls her spouse telling him she was the "only r&b singer" chosen and that she was "thinking about her children, wishing her spouse could be there" and how she was crying because a career in the music industry was her dream.

175.    One of the contestants who did not make it, took Defendant Diddy's previous advice, and began spazzing out. Defendant Diddy stated "someone's spazzing out there" and instructed his security to "take care of that."

176.    The only contestants who remain in the house are the individuals selected for the group.

177.    The episode ends with Defendant Diddy explaining how he arrived at his selections.

178.    Defendant Diddy stated he chose Plaintiff because her "beautiful melodic voice" complimented the voice of another group member. Defendant also went on to say how

Plaintiff "wanted it so bad," how he "liked that about her" and how he liked someone with Plaintiff's "drive, determination and commitment."

179.    Defendant Diddy states how the "process has just begun" and that the real true process isn't until it's time to put together the album, single, music video.

180.    Defendant Diddy then leaves off stating that if we thought the show was "dramatic" before we "aint seen nothing yet."

### MTB2 Season 2 Episode 1- THE CHEESECAKE EPISODE [23]

181.    The theme song to this season was written, composed and performed by Plaintiff and the group. This was the first theme song written, composed and performed by Plaintiff and the group to accompany this season of the television show.

182.    This episode is widely popular due to its outrageousness and subsequent parody by Dave Chappelle on Chappelle's Show.

183.    Defendant Diddy starts episode announcing he is 100% owner of Defendant BBE record label and he signed a new record distribution deal, presumably with Defendant UMG.

184.    Defendant Diddy alerts the audience he is working on producing the following music artists albums, Mary J. Blige, Carl Thomas, Loon, Faith Evans and MTB2 group.

185.    The six group members return from brief hiatus to NYC where they update Defendant Diddy on their whereabouts since he last seen them during filming of season one.

---

[23] Air date June 18, 2003
https://www.youtube.com/watch?v=GllVbgne2oE&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=1

186.    Group members say they have been doing shows and enjoying the fame they received from being on the television show MTB2, much to the dismay of Defendant Diddy.

187.    Defendant Diddy will not allow the group to move into their home until they "pay their dues." "Paying their dues" includes all six group members, males and females, to share one hotel room with two beds and WALK from Manhattan to Brooklyn, across the Brooklyn bridge, to get Cheesecake from Junior's restaurant, world renowned for their cheesecake.

188.    Defendant Diddy told Plaintiff and the group they could walk to Brooklyn to get the cheesecake or they could go home.

189.    Defendant Diddy continues to berate Plaintiff and the group yelling "it's not easy" and he "runs shit."

190.    When Plaintiff and the group contemplated going home because they could not comprehend complying with such an outrages request to walk from Manhattan to Brooklyn, an assistant of Defendant Diddy only identified as Akil, tries to convince the Plaintiff and the group to comply with Defendant's request and walk to Brooklyn to get the cheesecake.

191.    Plaintiff and the group were forced to walk over ten miles taking between six and eight hours, from Manhattan to Brooklyn, in the cold New York climate in order to comply with Defendant Diddy's outrageous and negligent demand.

192.    Plaintiff and the group were still walking back from Brooklyn well after 2:30 am.

193.    Defendants Diddy and MTV had a reckless disregard for the health and safety of Plaintiff, forcing her to comply with such an outrageous and unreasonable request simply

because she was a member of a group chosen by Defendant Diddy on Defendant MTV's television show.

194.    Once Plaintiff and the group returned to Manhattan where Defendant Diddy last seen, they were told he was no longer there and were sent away back to their shared one hotel room.

195.    Defendant Diddy defended his actions saying it was not "initiating or hazing" but that in the music industry one has to "do a bunch of shit they don't want to do, but [he] bite's [his] tongue and do it with a smile on [his] face."

196.    Defendant Diddy ended the episode referring to the upcoming days as "Hell Week."

**MTB Season 2 Episode 2- HELL WEEK (this is the actual title of the episode) [24]**

197.    Defendant Diddy continues to defend his outrageous and unreasonable request for Plaintiff and the group to walk to Brooklyn for cheesecake saying how in the music industry you "do a bunch of shit you don't wanna do."

198.    Defendant Diddy akin hip hop to the walk to Brooklyn. Defendant says the group he is making is not "Backstreet Boys or NSYNC."

199.    To further illustrate his point Defendant Diddy makes Plaintiff and the group wash cars, for free, at a for profit private car wash establishment.

200.    While Plaintiff and the group are washing cars, Defendant Diddy arrives and tells them "no more eating" as a further punishment because Plaintiff and the group dare to be enjoying their indentured servitude.

---

[24] Air date June 25, 2003
https://www.youtube.com/watch?v=Mc5x-Wnbd6M&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=2

201.     Defendant Diddy, that same day, then has Plaintiff and the group volunteer at a homeless shelter providing meals.

202.     Later that same day, Defendant Diddy then demands the Plaintiff and the group recite, verbatim, classic rap songs "Rappers Delight" and "Juicy."

203.     Defendant Diddy will not allow Plaintiff and the group to move into their home unless they can recite the songs, in unison and verbatim.

204.     Plaintiff, an R&B singer not a rapper, is unfamiliar with these works and has difficulty with Defendant Diddy's subsequent outrageous request.

205.     Defendant Diddy growing irater with the groups failure to recite the songs, in unison and verbatim, yelled at the group to leave the premises and banished them out into the cold until they had complied with his request.

206.     The group becomes frustrated with Plaintiff's lack of knowledge of the songs causing Plaintiff stress and emotional distress.

207.     Plaintiff tries to explain to the group her lack of familiarity with the songs is because she is a "singer " and she "doesn't rap."

208.     Plaintiff becomes so frustrated that she exclaims she should "go home" because "Sara isn't hip hop."

209.     Another group member says it will take group three days to comply with Defendant Diddy's demand because of Plaintiff's inability to learn the lyrics to the songs.

210.     Plaintiff is up until at least 4:30 am trying to comply with Defendant Diddy's demands and learn the lyrics to the songs.

211.     Plaintiff states, "Puff got me rapping…gotta do it."

## MTB Season 2 Episode 3 – FONZWORTH BENTLEY [25]

212.    In this episode the world is introduced to Defendant Fonzworth. Represented as a former butler turned executive for Defendants Diddy and BBE.

213.    Defendant Fonzworth's title is "tour manager" for Plaintiff and group despite the group not being on as they were on lockdown in the home to create an album and had no music to tour with. Defendant Fonzworth admits he was "appointed" to be in the house to watch the group by Defendant Diddy.

214.    Defendant Fonzworth moves into the home with Plaintiff and the group.

215.    Defendant Harve tells Defendant Fonzworth to go "into overdrive" with Plaintiff and the group.

216.    Defendant Fonzworth states to Plaintiff and the group, "no one can leave the house."

217.    Defendant Fonzworth, an uninvited guest, has Plaintiff and the group rehearsing at 1 am.

218.    Defendant Diddy praises Plaintiff and the group saying, "they have what it takes," can really be a hot group," and "make some noise in music."

219.    In this episode Defendant Diddy "inspects" Plaintiff and the group members.

220.    Defendant Diddy "inspects" Plaintiff and questions Plaintiff if she had "gained weight."

---

[25] Air date July 2, 2003
https://www.youtube.com/watch?v=Mc5x-Wnbd6M&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=2

221.    Defendant Diddy tells Plaintiff that, "one of her jobs is for guys to look at her a

lot," that her stomach looked "loose" and that if she was going to show her stomach she

should "make sure it was right."

222.    Defendant Diddy then makes Plaintiff turn around so he can look at her backside.

Defendant then tells Plaintiff "everything needed to get firmed up."

223.    Plaintiff was the only individual who Defendant Diddy scrutinized in such a

sexual and humiliating manner.

224.    Defendant Diddy then suggests Plaintiff should run with the largest male member

of the group in the effort for both individuals to lose weight.

**MTB Season 2 Episode 4 – SIGNING DAY/FIGHT [26]**

225.    Plaintiff and group members sign contracts with Defendant BBE.

226.    Defendant Diddy states, "once ya in aint no way out" regarding contracts Plaintiff

signed with his label.

227.    Defendant Diddy makes the further outrages and unreasonable demand for

Plaintiff and the group to complete an album in six weeks.

228.    Plaintiff comments that to complete an album in such short timeframe is "crazy

pressure" and that it "usually takes a year to make an album."

229.    Despite the pressure, Plaintiff and group try to comply.

230.    Defendant Fonzworth discusses how group is averaging seven songs a day in an

effort to comply with the outrageous album demand by Diddy.

---

[26] Air date July 9, 2003
https://www.youtube.com/watch?v=cVIwRVhbYjc&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=3

### MTB Season 2 Episode 5 –PLAINTIFF STRUGGLES AS R&B SINGER IN RAP GROUP[27]

231.     Defendant Diddy tells Plaintiff and group they have two weeks to produce a single.

232.     Defendant Dofat is introduced as the producer for the album.

233.     Plaintiff begins to struggle as the only r&b singer in a rap group.

234.     Plaintiff begins to feel like an "outcast" and "alone" and unable to concentrate due to the hostile work environment she has been unknowingly thrusted into.

235.     Defendant Diddy even opines that Plaintiff is "like the outcast nobody connects too" and that it has to "be really lonely for her."

236.     Defendant D.Dot discusses with the group how to put together album and songs. Defendant suggests that Plaintiff hasn't found herself yet and that there are "17 million chicks like her who aint found themselves yet… chicks 35." Defendant did not advance where he acquired such statistic.

237.     Plaintiff, speaks to her eight-year-old son who asks her if "Mommy is a superstar."

238.     Plaintiff speaks with her six-year-old daughter who tells her she loves Plaintiff.

239.     Plaintiff discusses how hard it is being away from her young family to chase her dream.

240.     Defendant Fonsworth then offers Plaintiff and the group the opportunity to go clubbing with alcohol and to have a house party after.

---

[27] Air date July 16, 2003
https://www.youtube.com/watch?v=9Ca0CtaMUak&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=4

241.    Plaintiff who is a consummate professional and whose voice had been suffering, declined the invitation stating "smoking and alcohol wasn't going to help" her voice.

242.    Plaintiff is seen alone in the house, working on writing music then eventually going to bed.

243.    Between 4-5 am the rest of the group and Defendant Fonzworth return to the house with guests and continue partying despite Plaintiff attempting to rest upstairs.

244.    The next day Plaintiff gets into an argument with another group member because he drank her milk without contributing to the communal grocery fund.

245.    Plaintiff continues to struggle vocally due to lack of adequate rest, stress from the group, isolation and constant smoking by the other group members.

246.    As a way to cope with the unwavering stress, Plaintiff is seen going to a bar and turning to alcohol to cope.

247.    When Plaintiff returns to the home, tipsy on margaritas, Defendant Diddy shows up unannounced.

248.    Defendant Diddy noticed Plaintiff was impaired and decided to pick on her, which Plaintiff responded, "why did [she] have to be uptight all the time."

249.    Plaintiff asks Defendant Diddy if they could speak one on one so she could understand his vision for her voice in the group.

250.    Defendant Diddy declines and responds he "can't answer." Plaintiff is a "curveball" and a "secret weapon." That Plaintiff's primary thing is not hip hop and that she understands "you just got to make things happen."

251.    The lack of clarity caused Plaintiff to exclaim she would just need to "keep going" and "work harder."

## MTB Season 2 Episode 6 – THE WYCLEF EPISODE [28]

252.    Plaintiff and the group travel with Defendant Diddy to DC to an event he is hosting.

253.    Plaintiff works with a vocal coach where she reveals that she "is her worse enemy."

254.    Plaintiff is working on songs with the group and Defendant Dofat wants Plaintiff to "rap sing."

255.    Plaintiff who is a r&b singer and not a rap singer is unfamiliar with how to comply with Defendant Dofat's request. Defendant Dofat is ill equipped to adequately convey what he wants Plaintiff  to do so that she can remotely attempt to comply.

256.    Defendant Dofat then goes to Defendant Alison defaming Plaintiff because she was unfamiliar with how to "rap sing."

257.    Defendant Dofat accused Plaintiff of being "inexperienced" and lacking formal vocal lessons to justify why Plaintiff was unable to "rap sing."

258.    While working with music artist Wyclef Jean, Plaintiff is seen drinking copious amounts of tea in an effort to save her voice.

259.    Plaintiff complains her "voice isn't working."

260.    Wyclef then does some vocal coaching with Plaintiff where then Plaintiff returns to sing in line with her natural voice.

261.    While recording individuals in the studio, executives for Defendant BBE mock the way Plaintiff said "alright," visibly causing the Plaintiff further anxiety and stress.

---

[28] Air date July 23, 2003
https://www.youtube.com/watch?v=Ptn0mSvZeqk&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=5

## MTB Season 2 Episode 7 – SHUT DOWN STUDIO [29]

262.    Defendant Diddy tells Plaintiff and group that they are "not that hot," "don't have a hit record," and "don't have a hit single."

263.    Defendant Diddy tells Plaintiff and group that he is considering putting their music on the Bad Boys 2 Soundtrack.

264.    Defendant Diddy tells Plaintiff and group that they are one group among twenty other acts on the label.

265.    Upset due to fighting between group members, Defendant Diddy berates the Plaintiff and group that people dream to have this chance then when get it they treat it like this.

266.    Defendant Diddy tells Plaintiff and group that anybody who got really big had to sacrifice something. Defendant Diddy then names "Madonna, Michael Jordan, Jay Z, Biggie, Tupac and [himself]" as individuals who got really big and had to sacrifice something.

267.    Defendant Diddy tells Plaintiff and group that "80% of [his] day is doing stuff [he] doesn't want to do." Defendant Diddy describes he would prefer to "watch Scarface fifty times," "eat a turkey sandwich" and "have sex all day."

268.    Defendant Diddy tells Plaintiff and group that he "tried talking to [them] and anything else gone be an altercation" as he shut down the studio despite the album deadline readily approaching.

---

[29] Air date July 30, 2003
https://www.youtube.com/watch?v=ENmEld6M3h4&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=6

**MTB2 Season 2 Episode 8 – REOPEN STUDIO [30]**

269.     Defendant Phil tells the group that Defendant Diddy wants to cancel the MTB2

show and the album and asked him to speak with Defendant MTV.

270.     Defendant Phil tells the group he couldn't get in touch with Defendant MTV until

Monday so that the group had until Monday to change Defendant Diddy's mind.

271.     Plaintiff calls spouse to inform him that if they do not have the music completed

by Monday she will "come home with nothing."

272.     Plaintiff and group begin to interview potential managers.

273.     Plaintiff refers her personal attorney Howard Hertz, who is interviewed by the

group to be a manager.

274.     Defendant Lou was interviewed by the group to be a manager.

275.     Defendant Lou was asked about Defendant Phil's potential conflict as manager

for Defendant Diddy and manager for the group. Defendant Lou stated he did not see any

direct potential conflict between Defendant Phil serving as both Defendant Diddy and the

group's manager.

276.     Defendant Phil also interviewed and was ultimately selected, predominately

because he had been filing that role in an acting capacity until that point.

277.     Defendant Phil remarks that Defendant Diddy has "creative control as executive

producer" over the television show MTB2.

278.     Plaintiff and group eventually beg Defendant Diddy to reopen the studio so they

can complete the album and he reopens the studio so that they can comply with the

deadline to produce the album.

---

[30] Air date August 6, 2003
https://www.youtube.com/watch?v=Pw_lfhP72qs&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=7

279.     Defendant Diddy says he thinks the group is "talented, and a great addition to Bad Boy" and that he was excited to "make some history together."

### MTB2 Season 2 Episode 9 – GROUP NAMED "DA BAND" [31]

280.     Plaintiff and group have a meeting with Defendant Phil at Defendant BBE's offices in relation to their contract with Defendants BBE.

281.     Defendant Phil informs Plaintiff and group they will split three out of one hundred points on their debut album as mechanical royalties. (Approximately a half point per person per album sale).

282.     Plaintiff is at her boiling point sating she "can't take [fighting and the negative environment] anymore."

283.     Defendant Fonzworth tells the group their fighting makes "white people nervous" and that when "white people get nervous they make laws called Jim Crow."

284.     Defendant Diddy states that "rule 1 in reality tv is keep the cameras rolling."

285.     Defendant Shawn is introduced to group as Director of Promotions at Defendant BBE.

286.     Defendant Diddy tells Plaintiff and group they are obligated to make the album.

### MTB2 Season 2 Episode 10 – PLAINTIFF'S SPOUSE VS. GROUP [32]

287.     Plaintiff attempts to address her grievances regarding working and living conditions with Defendant Alison.

---

[31] Air date August 13, 2003
https://www.youtube.com/watch?v=6B-HrQPmu3c&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=8
[32] Air date August 20, 2003
https://www.youtube.com/watch?v=MS7wEbH3ubY&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=9

288.    Plaintiff is continuing to struggle with her voice due to a myriad of unaddressed issues, primarily stress.

289.    Plaintiff's primary frustration is that Defendants want her to do the "Beyonce vibrato" when she is "not Beyonce."

290.    Plaintiff becomes so stressed and disheartened with the process she asks her spouse for a ticket to return home.

291.    Plaintiff then leaves the home for air because she is feeling "crazy, irritated and wanted to punch a wall."

292.    Group members go out to the club leaving Plaintiff home alone again.

293.    While on the phone, Plaintiff's spouse tells Plaintiff that "crying aint gone get it" and to "suck it up."

294.    Seemingly having nowhere to turn, Plaintiff is still very visibly distraught when the group goes to visit Defendant Diddy.

295.    Defendant Diddy asks Plaintiff if everything okay.

296.    Defendant Diddy asks Plaintiff to have a private conversation about Plaintiff's issues where Defendant Diddy tells her, "you can't get nothing you really want out of life that won't have some level of pain involved.... gonna get worse, but then get better than ever imagine."

297.    Plaintiff, seriously missing her three minor children and spouse, said she just wanted to go home for a couple hours.

298.    Instead, Plaintiff's spouse brings their young children to visit Plaintiff in NYC where Plaintiff is able to briefly spend time with her family.

**MTB2 Season 2 Episode 11 – MISSING BAND MEMBER** [33]

299.      More fights ensue between male group members.

300.      Plaintiff and group are transported to SIR Studios for rehearsal.

301.      Rehearsal is cancelled because an individual was missing from the group. The group is provided a bill for the rehearsal for $175/hour for three hours, due to the late booking.[34]

302.      Defendant Harve tells Plaintiff and group they make money from "selling records and doing shows."

303.      Plaintiff and group meet Defendant Janice, presumably to sign over their publishing rights to Defendants JCP and JCPH.

304.      Defendant Diddy says it is tradition that Defendant Janice meets all the artist signed to Defendant BBE.

305.      Plaintiff and group then do radio promotion at Hot 97 with DJ K-Slay, who is now deceased.

**MTB2 Season 2 Episode 12 – ADVANCE MONEY** [35]

306.      Defendant Phil brings Plaintiff and group contracts to execute. Defendant represents these contracts must be signed so the group can be paid advance money on their album.

---

[33] Air date August 27, 2003
https://www.youtube.com/watch?v=jUlZ396beoM&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=1 0
[34] Why rehersal time was booked late at a higher rate was not explained.
[35] Air date September 3, 2003
https://www.youtube.com/watch?v=cAwd2HmuVLE&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=11

307.    Defendant Phil states these contracts are not the final contracts but are contracts stating that Plaintiff and group would be bound to the terms of a future contract, that has yet to be drafted, presented or reviewed.

308.    Defendant Phil went on to attest to Plaintiff and group that these contracts needed to be signed so that the label, Defendant BBE, could pay the groups advances in good faith.

309.    Defendant Phil also explained that he needed the contracts signed right then, immediately, because he had to turn them into Defendant BBE for processing checks, then had to get it to Defendant MTV on Thursday to have a check for Friday.

310.    Plaintiff, uneasy about signing a contract without having an attorney review it, asks Defendant Mickey if she has to sign in order to get paid.

311.    Defendant Mickey tells Plaintiff that not only does she have to sign to get paid but her failure to sign would cause the other members in the group to forego their payments.

312.    Defendant Mickey can be seen directing the members of the group to the last page for their signature bypassing all the contract terms.

313.    Plaintiff tries to read the contract and contacts her spouse regarding this pressurized environment. Plaintiff does not want to sign the contract because she wanted to have it reviewed by her attorney first but Plaintiff feels pressured not to prevent the other group members for payment.

314.    An argument ensues between the other group members and Defendant Fonzworth regarding Plaintiff's apprehension on signing the contract and Plaintiff's need to consult her spouse.

315.	Outnumbered and under duress, Plaintiff signed the contract against her better judgment and without the opportunity to have her legal counsel, Mr. Hertz, review it.

316.	Once the contracts are signed, Defendant Diddy arrives with champagne and cameras to take photos.

317.	Defendant Fonzworth takes some members of the group to a jewelry store owned by Jacob the Jeweler.

318.	Friday arrives and the group has no checks. Defendant Mickey is contacted by one of the group members to inquire on the status of thier payments which Defendant Mickey says he had bad news that he did not have their checks.

319.	Plaintiff remarked that she felt "dumb" for her decision not to get the contract looked at by a lawyer before signing it. Other members of the group echo Plaintiff's sentiments.

320.	When Plaintiff and the group inquired to their late payment, Defendant Shawn told them they were spoiled and analogized them not getting paid to a dad promising his child a new bike (a baffling analogy).

321.	Defendant Diddy defends being in breach of contract and failing to provide the checks on the agreed upon date, stating that Defendant BBE was not "homeboy records" and "checks not being cut out of shoeboxes."

322.	Defendant Diddy continues his lesson that one can't get "success without paying price" and the key to the group being successful is them "being smart."

**MTB2 Season 2 Episode 13 – FINALE [36]**

---

[36] Air date September 10, 2003
https://www.youtube.com/watch?v=rk4y-_vnv-o&list=PLQbW3vsQ2AUS9MIHZttpPTS5dVqVpY1CP&index=12

323.    Defendant Phil warns Plaintiff and the group that they could sell a million records then "fall off like O-Town."

324.    Defendant Diddy tells Plaintiff and group they have two days to finish five songs.

325.    Defendant Diddy tells Plaintiff and group that their music careers "aint gone come without paying the price."

326.    Defendant Diddy sets up a listening party with press including Vibe and The Source magazines.

327.    Celebrity music producer Stevie J makes a cameo at the listening party.

328.    Defendant Diddy praises Plaintiff and group saying they "sound like stars," he "followed them thru their dreams of being recording artist," they made an "incredible album" and the opportunity to work with him was something God blessed them with.

329.    Defendant Diddy again attempts to provide context to forcing the group to  walk for cheesecake as not letting anything stand between you and achieving your dream.

330.    Plaintiff and the group finally receive their checks and depart the house they were living and recording in.

331.    Plaintiff and the group released their first studio album on September 30, 2003, called Too Hot for TV.

**TOO HOT FOR TV ALBUM**



332.     "Too Hot for TV" was released on September 30, 2003.

333.     "Too Hot for TV" sold 500,000 copies and is RIAA certified gold.

334.     Under information and belief, "Too Hot for TV" sold over 800,000 copies.

335.     "Too Hot for TV" is available for purchase and download as of the date of this filing.

336.     Defendants BBE and UMG were responsible for the promotion and distribution of "Too Hot for TV."

337.     "Too Hot for TV" is composed of eighteen songs.

338.     Of the eighteen songs four of the songs are interludes. Three interludes are less than one minute featuring members of the group "Da Band."

339.     Conspicuously, the only other interlude that is not one minute but three minutes, is a song with Defendants Fonzworth and D.Dot as Madd Rapper, two individuals who were not nor ever been contemplated as members of the group "Da Band."

340.     Another song titled "How You Like Me Now" also features an individual who was not part of the group Da Band and is not credited on the song, female emcee Mysterious.

341.     Plaintiff did not approve, consent or have knowledge that other individuals not members of the group "Da Band" would be featured on the album until after the album's release.

342.     Plaintiff wrote, composed and performed on eight of the fourteen remaining tracks on the album "Too Hot for TV."

343.    Plaintiff wrote, composed and performed on the songs Tonight, a single from the album, My Life, Go Steady, How You Like Me Now, Like Your Style, What We Gone Do, Do You Know with Wyclef Jean, and Why featured on the Bad Boys 2 soundtrack.

344.    Plaintiff has not received any executed copy of any contracts with Defendants BBE, MTV, JCP or UMG.

345.    Plaintiff has not received any information related to copyright of all original compositions made on the Too Hot for TV album.

346.    Plaintiff has not received any information related to copyright all original compositions made on the two MTB2 theme songs.

## BAD BOYS II SOUNDTRACK



347.    The Bad Boys II soundtrack was released to accompany the second installment of the movie franchise Bad Boys, starring Will Smith and Martin Lawrence.

348.    The Bad Boys II soundtrack sold over one million copies making it certified Platinum

349.    The Bad Boys II soundtrack was released on July 15, 2003.

350.    The Bad Boys II soundtrack was executively produced by Defendant Diddy.

351.    The Bad Boys II soundtrack was released through Defendants BBE and UMG music enterprises.

352.    The Bad Boys II soundtrack included a song Plaintiff wrote, composed and performed titled "Why."

353.    The work "Why" opens telling the story of Lucifer by one of the group members. The chorus to the song is " why the devil keep on fucking with me?/ Why he knocking at my door?/ Why the devil keep on fucking with me?/Could you tell me what he's hunting, tell me what he's hunting me for?" and ends with Defendant Diddy saying he is the "dark angel" and he "saw all you devils out there, you could never stop us."[37]

354.    The Bad Boys II soundtrack was released ten weeks before the Plaintiff's group album with the same song was released on September 30, 2003.

355.    Plaintiff does not recall signing any contract or documentation relating to the use of her work on the Bad Boys II soundtrack.

356.    Plaintiff does not recall receiving any compensation relating to the use of her work on the Bad Boys II soundtrack.

357.    Plaintiff does not recall receiving any royalties relating to the use of her work on the Bad Boys II soundtrack.

**MTB2 Season 3 Episode 1 – ALBUM RELEASE & TOUR [38]**

358.    Defendant Diddy announces season three is the final installment of MTB2, following same format of MTB1 with "O-Town."

---

[37] Minute 4:20 in song.
[38] Air date March 4, 2004
https://www.youtube.com/watch?v=YxLR3jUCP_0&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9

359.      Defendant Diddy is wearing a mohawk, this was commonly known as the "Diddy runs the city" era as Defendant Diddy was training to participate in the New York City Marathon.

360.      Defendant Diddy announces that Plaintiff and the group's album is sold out everywhere and they have a chance at being #1.

361.      Plaintiff and the group's album sold 75,000 copies in the first day.

362.      Plaintiff and the group's success is shown in a press run to Defendant MTV's show hosted by Lala (Vasquez) Anthony.

363.      Plaintiff discusses how fans are "banging out windows" to see her and her group members when they are out, commonly called "boy band" frenzy.

364.      Plaintiff and the group attend a meeting at Defendant UMG's building to meet with Defendant Diddy.

365.      Defendant Diddy announces the album Too Hot for TV is #2 on the pop charts and #1 on the rap charts.

366.      Defendant Diddy, who can never be pleased, happy or satisfied, goes on to state how Plaintiff and the group have a "long hard road" ahead of them and he did not know "if they were going to make it."

367.      Defendant Diddy intentionally made the tour scheduling grueling in an effort to "test how bad [they] wanted this" and to "test their loyalty to each other."

368.      Defendant Diddy remarked Plaintiff would not get to spend time with her children.

369.      Defendant Diddy then has Plaintiff and the group move into the W hotel while their tour arrangements are being arranged.

370.        Out of nowhere, a new tour manager emerges Defendant Jason. No explanation was provided about where Season 2's tour manager Defendant Fonzworth disappeared to.

371.        Plaintiff and the group embark on their first tour stop at Morehouse College.

372.        Plaintiff remarks how getting on the road and going on tour "feels good" because she is doing something she has been "dreaming about for a long time."

373.        Plaintiff and the group's second tour stop is in Charlotte, NC.

374.        Plaintiff and the group's third tour stop is in Miami, FL.

375.        Plaintiff and the group's fourth tour stop is in Greensboro, NC.

376.        Plaintiff vents that the group is overworked and is "sometimes doing two show in the same night."

377.        Plaintiff continues that the rough tour schedule "affects her family life big time and her kids miss her but they know Mommy is out there singing."

378.        Plaintiff encounters a family emergency when she finds out her mother is needing surgery.

379.        Plaintiff ends up leaving to go see her mother.

380.        Plaintiff and the group's fifth tour stop is in Durham, NC.

**MTB2 Season 3 Episode 2 –TOURING [39]**

381.        Plaintiff and the group's sixth tour stop is in Atlanta, GA at V103.

382.        Defendant Diddy admits that "without radio [he] can't get music out as quickly as we want" and that why he tries to stay on "good terms with radio."

383.        Plaintiff and the group's seventh tour stop is in Houston, TX at 97.9 "The Box."

---

[39] Air date March 11, 2004
https://www.youtube.com/watch?v=ZL3abxY9yEo&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=2

384.     Defendant Diddy refers to Plaintiff and the group as the "hip hop NSYNC."

385.     Plaintiff and the group's eighth tour stop is in Miami, FL at 103.5 "The Beat."

386.     Plaintiff and the group's ninth tour stop is in Salisbury, NC at Livingston College.

387.     After all these shows, Defendant Jason is seen delivering cash payments to
Plaintiff and the other group members. Plaintiff believes these payments were in the
amount of a flat fee of $5,000 per group member per show.





388.     Plaintiff and the group come up with a "deduction song" for members who
chronically miss tour dates.

389.     Defendant Diddy demands Plaintiff and the group return from touring, back to
NYC to do a photo shoot for the next single from the album, "Tonight."

390.     Defendant Diddy makes Plaintiff dress sexy in lingerie and pose on a bed for the
"Tonight" photo shoot.

391.        Defendant Diddy then decides if he will push a third single from the "Too Hot for

TV" album or if he will force Plaintiff and the group to make another album under

unreasonable time constraints and conditions again.

**MTB2 Season 3 Episode 3 –THE SMOKE [40]**

392.        Plaintiff and the group's tenth tour stop is in Detroit, MI, Plaintiff's hometown.

393.        Plaintiff is at odds with the group because of their constant cigarette smoking.

394.        Plaintiff expresses she wants to "relax by herself so that she has time to think."

395.        Plaintiff and the group's eleventh tour stop is in Columbus, OH.

396.        Plaintiff again complains about the constant smoking in close quarters because

her voice is "suffering," is "hoarse," she "couldn't hit her high notes" and that the

constant smoking was making it worse.

397.        One of the smokers, the only other female in the group, called Plaintiff a diva.

398.        Plaintiff tries to mitigate the constant cigarette smoke in close proximity asking

her group mates if they could open a window while they smoked, which they initially did

but then closed later because it was making them cold.

399.        Plaintiff growing visibly upset exclaimed that her "voice was touched by God"

that "God gave her this voice" and she was not going to let anyone ruin it.

400.        Plaintiff's spouse shows up where she confides in him about the smoking issue.

401.        Plaintiff's spouse discusses the issue with Defendant Jason who's reply is that

Plaintiff is not perfect and she needed to deal with their constant smoking the same way

---

[40] Air date March 18, 2004
https://www.youtube.com/watch?v=ziZRx3kix6o&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=3

they had to deal with Plaintiff's alleged chronic lateness. Plaintiff later refutes this to Defendant Jason.

402.    Plaintiff and the group's twelfth tour stop is in Charlotte, NC described as a "little club in the hood."

403.    While at this tour stop a patron throws a drink at Plaintiff, soaking her.

404.    Plaintiff is able to point out the assailant to security who physically remove him from the venue.

405.    Shortly thereafter, Plaintiff and the group make a hurried exit to their car as guns are drawn by security.

406.    Plaintiff expresses her frustration from the disrespect of having a drink thrown on her.

407.    Defendant Diddy hears about the incident and states he won't let the group bring down the Bad Boy brand.

408.    Defendant Diddy also says Bad Boy the company, "represents excellence and also responsibility to carry themselves in the most professional way possible."

409.    Defendant Diddy then requests Plaintiff and the group return from tour, back to NYC.

410.    Upon their return, Plaintiff attempts to address the smoking issue with Defendant Diddy, her boss. Instead of listening and carry himself in a professional way, Defendant Diddy made fun of and mocked Plaintiff responding to her very valid and reasonable complaint with "womp, womp, womp."

411.    Defendant Diddy further tells Plaintiff she needs to toughen up, as if it is a way to toughen up enough to not be exposed to cancer from secondhand smoke.

412.    Defendant Diddy then tells Plaintiff and the group they will now be residing with him at his Park Avenue residence.

413.    Plaintiff, still unsatisfied and hurt from her meeting with her boss Defendant Diddy contacted her spouse to discuss the smoking issue.

414.    Plaintiff said she felt Defendant Diddy made fun of her.

415.    Plaintiff said Defendant Diddy told her to toughen up but she's already a tough person.

416.    Defendant Diddy then returns to his residence where he demands all the members of the group eat with him.

417.    Seeing Plaintiff is clearly still in distress from their previous interaction Defendant Diddy decides to antagonize Plaintiff further.

418.    Defendant Diddy expressed he believed Plaintiff's real issue wasn't the smoking it was her being "realistic" and that "life wasn't fair baby girl."

419.    Defendant Diddy expressed he believed it was his responsibility to be tough on Plaintiff.

420.    Defendant Diddy expressed he believed it was his responsibility to be tough on Plaintiff because if he was not others would take advantage of her.

421.    Defendant Diddy then made Plaintiff pray over the food, which she did with humility and grace.

422.    Defendant Diddy continues antagonizing Plaintiff asking her why she wasn't eating and asking her "how far were we going to push this."

423.    Defendant Diddy then accuses Plaintiff of rolling her eyes at him.

424.     Plaintiff, obviously distraught, just wants time to think and allowed this issue to get her unfocused.

### MTB2 Season 3 Episode 4 – PLAINTIFF vs. EVERYBODY [41]

425.     Plaintiff and the group's thirteenth tour stop is in Birmingham, AL.

426.     Defendant Diddy complains about the lackluster stage performances of the group and offers showmanship tips.

427.     Defendant Diddy says that it was times the other group members alienated Plaintiff but it was "time to bring her into the fold."

428.     Plaintiff is told that her daughter has pneumonia. Plaintiff wants to go home to be with her sick child but her group members resist her request to go home.

429.     Since Plaintiff's group members oppose her request to return home to tend to her sick child, this causes problems between Plaintiff and her spouse.

430.     Plaintiff complains that she doesn't know if the music career is worth it considering she couldn't even leave to check on her sick child.

431.     Defendant Jason finds a compromise for Plaintiff to leave to check on her child after the show.

432.     Defendant Diddy, apparently bored that no altercations occurred is seen yelling "Fight, Fight, finally have a fight."

433.     The fight Defendant Diddy is referring to is between Plaintiff and another group member over Plaintiff's spouse.

---

[41] Air date March 25, 2004
https://www.youtube.com/watch?v=KDGDker9lZo&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=4

## MTB2 Season 3 Episode 5 – MORE TOURING [42]

434.    At 4:15am, Defendant Diddy enters the residence where Plaintiff and the group live, in a yellow bathrobe eating cereal, yelling and cursing about the unkempt nature of the home.

435.    Defendant Diddy calls Plaintiff and the group, "stanky ass heathens."

436.    Plaintiff and the group's fourteenth tour stop is in Detroit, MI, at a coats 4 kids' event.

437.    Plaintiff and the group discuss how crazy the fans get including the fans were attempting to pull Plaintiff's purse off her.

438.    While at the hotel, Plaintiff expressed how she was "tired of running" because the fans were always chasing them.

439.    Defendant Diddy calls fame a drug.

440.    Plaintiff and the group's fifteenth tour stop is in Kalamazoo, MI.

441.    Plaintiff and the group's sixteenth tour stop is in New Orleans, NO at Hot 104.5 radio station.

442.    Plaintiff and the group's seventeenth tour stop is in Steubenville, OH.

443.    Plaintiff and the group then return back to NYC at Defendant Diddy's behest.

## MTB2 Season 3 Episode 6 – PLAINTIFF vs. EVERYBODY 2 [43]

444.    Defendant Diddy has the group recording a second album.

---

[42] Air date April 1, 2004
https://www.youtube.com/watch?v=UBGYJtgSlpo&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=5
[43] Air date April 8, 2004
https://www.youtube.com/watch?v=9ZrcDDA_InQ&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=6

445.    Plaintiff expresses same frustration from first album with other group members not writing with her or intentionally writing gangsta rap music that can't be accompanied by a melody or singing.

446.    Other group members accuse Plaintiff of not being focused simply due to Plaintiff's inability to write raps.

447.    Plaintiff again express her feelings of being alone within her group.

448.    Defendant Jason gaslights Plaintiff into believing she is the reason people were not writing with her.

449.    Plaintiff defends herself saying she tries to write but the beats being chosen leaves "nothing to write a melody too."

450.    Plaintiff's spouse visits Plaintiff at the Park Avenue residence.

451.    Members of the group assert their dislike for Plaintiff's spouse saying that "nobody likes him," he is hated and that Plaintiff has to "go thru him" for everything.

452.    Plaintiff leaves with her spouse to visit her publicist.

453.    Plaintiff returns to her King Magazine spread being ogled by members of the group.





454.    Plaintiff then has a telephone interview with WGCI, incorrectly referred to as a gospel station, where Plaintiff complains about the group smoking around her, which is overheard by one of the group members.

455.    The member who was eavesdropping told the other members and then again called Plaintiff a "diva."

456.    The member who was eavesdropping then refuses to work with Plaintiff because she was "still made at her."

457.    Another member remarked that he could tell Plaintiff was not "totally happy in the situation with [them]."

458.    Plaintiff continues to voice her frustrations about the constant fighting, smoking and people having problems with her and that she was "fed up."

459.    Plaintiff said she realizes she is not there to make friends but there to "make it."

460.    Defendant Diddy then chimes in that there has always been a "struggle between singers and emcees." Yet, Defendant Diddy intentional put Plaintiff in situation where she was isolated and outnumbered.

461.    Defendant Diddy further remarked that the other group members did not respect Plaintiff's talent because they were not singers themselves.

462.      Plaintiff and her spouse then arrive at a recording session with the group.

463.      One of the group members, the same one eavesdropping, is asked by Defendant

Dofat to stop smoking and for her friends to leave so that a meeting with the group can

occur.

464.      The group member then says that Plaintiff's spouse is still present and should

have to exit as well. An argument ensues between that group member and Plaintiff's

spouse. Plaintiff remains silent during this verbal altercation between them.

465.      Plaintiff's reasoning for remaining silent was because she had young children at

home and would not "buck" on television.

466.      This fight drives a further wedge between Plaintiff and her bandmates.

467.      Plaintiff's only thought is she doesn't know what to do but "do what I do best

that's sing."

468.      Defendant Phil has a meeting with Plaintiff and the group at Defendant BBE's

offices.

469.      Plaintiff brings up the issues with the arguments prior.

470.      Defendant Phil, as a result, bans Plaintiff's spouse from their residence and the

studio.

471.      Plaintiff, without any ally, tries to discuss the matter with her boss, Defendant

Diddy once more.

472.      Defendant Diddy repeats his initial sentiment that Plaintiff needs to "toughen up."

473.      Defendant Diddy tells Plaintiff to "fight back" because she had one of the

brightest futures amongst the members of the group.

474.      Plaintiff said she is a fighter just not physical.

475.      Defendant Diddy remarked on Plaintiff's character saying she was a good person and has a "sense of humility and values" and that those things take you into longevity.

476.      Defendant Diddy further remarked on Plaintiff's character saying she had such a good heart but wanted her to be tough but also didn't want her to change her heart.

**MTB2 Season 3 Episode 7 – THE SECOND ALBUM [44]**

477.      Plaintiff and the group are now stationary in NYC, at Defendant Diddy's Park Avenue Residence recording their sophomore album.

478.      Defendant Diddy wants to ensure the second album goes Platinum.

479.      Plaintiff advances her concerns that the group is not "collaborating like they use to" and that she believes Defendant Diddy has shown favoritism towards another group member.

480.      Defendant Diddy brings group into his office to watch videos of them from Season 1 in an effort to reignite their passion for the second album.

**MTB2 Season 3 Episode 8 – SELL A MILLION RECORDS, BY ANY MEANS NECESSARY [45]**

481.      Plaintiff and the group meet with Defendant Diddy.

482.      Defendant Diddy expresses his desires to have the "Too Hot for TV" album be certified Platinum in the upcoming months.

---

[44] Air date April 15, 2004
https://www.youtube.com/watch?v=Rl_DK1hH0bM&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=7
[45] Air date April 22, 2004
https://www.youtube.com/watch?v=MKM7MbqLOsQ&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=8

483.     Defendant Diddy told Da Band he had "bills to pay" so they had to sell one million records.

484.     Defendant Diddy says you have to "respect the game or its going to make you respect it by sidelining your butt." (Ironic given Defendant Diddy's current state).

485.     One of the group members ask Defendant Diddy about a per diem, which Defendant Diddy says the only money requests directed at him should be for $100,000 or more.

486.     Plaintiff was told to participate in a photoshoot with Elle Girl Magazine.

487.     Plaintiff and the group attend a Teen People Party.

488.     Plaintiff and the group attend a Hip-Hop Summit for voting paneled by Russell Simmons, Reverend Run and LL Cool J.

489.     During this Summit, LL Cool J remarked to members of the group that he would have walked through "glass, barefoot" for the opportunity in the music industry. (Referring to the infamous cheesecake episode in Season 2 Episode 1).

490.     Vibe sends a correspondent to the residence of Plaintiff and the group to conduct an interview.

491.     The correspondent accuses the group of inauthenticity, which the group refuted.

492.     Defendant Diddy makes statements about how most new artist do not go Platinum on their first album but wanted to do something special with the group.

493.     Defendant Diddy goes on to further state he is willing to do whatever it takes to sell one million records including "pimping out" the other female group member, which he subsequently does via a blind date in partnership with Defendant King.

494.     Plaintiff and the other group members do a press interview with CNN.

## MTB2 Season 3 Episode 9 – THE FINAL TOUR PERFORMANCE [46]

495.    Rap pioneer Doug E. Fresh appears to assist the group on their stage presence for their final show in Chicago.

496.    Plaintiff and the group's eighthteenth, and final, tour stop is in Chicago, IL.

497.    Defendant Diddy remarks that we should watch what will happen next because it will be so shocking.

## MTB2 Season 3 Episode 10 – FINALE [47]

498.    Defendant Diddy is making decision on future of the group.

499.    Defendant Diddy is, seemingly, disappointed in the quality of the songs in the second album saying only four of the fifteen are usable.

500.    Defendant Shawn explains to Plaintiff and the group that if they got kicked out the group that they were "gone, it's over." Defendant Shawn further went on to warn that anyone kicked out of the group music career would be over and that they may as well "do something else" and "get music out ya life."

501.    Defendant Shawn told Plaintiff and the group the reason they would have to do something  other than music was because "nobody was going to go against Puff for [them]."

502.    Queen of R&B Mary J. Blige makes an appearance to discuss the music industry with Plaintiff and the group.

---

[46] Air date April 29, 2004
https://www.youtube.com/watch?v=gv8ljkRRzHY&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=9
[47] Air date May 13, 2004
https://www.youtube.com/watch?v=j7Rg5rD0RhQ&list=PLOEGQX-uQEmWt8XzCq5hP6HMhQ-Gjswz9&index=10

503.    A party is thrown by the group in honor of their last night in Defendant Diddy's residence.

504.    Plaintiff and the group have a meeting the following day with Defendant Phil at Defendant BBE's office.

505.    Defendant Phil expresses the decline in demand for the group for performances, despite offering no evidence in support of such assertion.

506.    Defendant Diddy then says, "just as a dream can come true it can be taken away from you" and that the group was in jeopardy of taking their "dreams away from themselves."

507.    Defendant Diddy has meeting with Plaintiff and the group to determine if there is a path to move forward.

508.    Plaintiff verbalizes a plan to move forward, replete with action steps.

509.    Defendant Diddy is unmoved and says how overall the group gave him lots of problems.

510.    Defendant Diddy makes the veiled threat that as long as he had anything to do with the music industry if any of the members of the group wanted to be in the music industry that they would have to "respect it." What Defendant defines as "respect it" is of great mystery.

511.    Defendant Diddy told Plaintiff and the group that he originally was not going to do the show because he believed reality tv was too "hokey for him."

512.    Defendant Diddy told Plaintiff and the group that they were a part of history, "history on what NOT to do."

513.    Defendant Diddy told Plaintiff and the group that they had two years to take advantage of this opportunity and they did not take such advantage.

514.    Defendant Diddy told Plaintiff he liked her as a person but felt Plaintiff had her own publicist that she could not be successful in a group and kept up drama.

515.    Defendant Diddy told Plaintiff she needed to walk before she ran.

516.    Defendant Diddy told Plaintiff and the group that "life begins now" now that the cameras would no longer be on them.

517.    Defendant Diddy told Plaintiff and the group that "Da Band" was being dismantled and that he was only retaining two of the six members.

518.    Defendant Diddy gives the final word, "all can learn from this situation, everyone out there dreams can come true, dreams can also be lost if you don't appreciate what God has blessed you with." Seems like Defendant Diddy is currently experiencing this parable.

519.    Defendant Diddy went on to continue to produce seven more seasons on MTB forming two groups after dismantling Plaintiff's group "Da Band."

**BEHIND THE SCENES OF MTB2**

520.    MTB2 was the first hip hop music-based reality show of its kind. Plaintiff and her group members were pioneers in this genre of television and music.

521.    Plaintiff believes that Defendants Lou, BM, MTV, and UMG offered Defendant Diddy the MTB franchise to revive his fledgling career after Defendant Diddy's nightclub shooting trial in 2001, where rapper Shyne was imprisoned for a decade as a result.

522.    Leading up to the 2001 trial, Defendant Diddy had been in multiple criminal legal matters. One in 1996, where he plead guilty to criminal mischief and paid a fine and again in 1999, where Defendant Diddy was alleged to have beaten up record executive, which Defendant Diddy plead down to harassment and was sentenced to anger management.

523.    It is clear Defendant Diddy never intended on finding a new group for his label as he did not retain a single group on his label after that group ceased recording their seasons for the MTB franchise.

524.    Defendant Diddy has blackballed and ostracized all members of MTB2 from any affiliation with the franchise.

525.    Defendant Diddy intended to reboot the franchise in 2020 but it was delayed due to the COVID pandemic and ultimately cancelled. Upon information and belief, Defendant Diddy did not invite any members from MTB2 to participate in the reboot.

526.    Plaintiff and the groups traumatic experience was so widely known that it was parodied during an episode of Dave Chappelle's show, Chappelle Show, where Plaintiff appeared.

527.    The appearance of Plaintiff and her group on Chappelle's Show was arranged by Defendants Diddy and BBE during the filming of MTB2.

528.    The appearance of Plaintiff and her group on Chappelle's Show occurred while Plaintiff was still filming the MTB2 series.

529.    Plaintiff was not compensated for her appearance or participation on Chappelle's Show.

530.     In or around the late Spring of 2002, Plaintiff discovered auditions for a group being formed by Defendant Diddy airing on Defendant MTV's network.

531.     Plaintiff auditioned in the open auditions in her hometown Detroit, MI.

532.     Defendant Harve, a local Detroit radio station, Defendant BM and Defendant MTV made the decision who moved to the next round for evaluation by Defendant Diddy. Defendant Harve is the one who ensured Plaintiff made it through next to meet Defendant Diddy.

533.     Once picked as a semi-finalist, Defendant MTV told Plaintiff to wait for a call about next steps for participation.

534.     In or about June 2002, Plaintiff received a call from Defendant MTV about traveling to NYC to audition for Defendant Diddy.

535.     Defendants BM and MTV did not provide Plaintiff any timeline for how long filming in NYC would commence nor did they provide her any contracts related thereto. The only timeline Defendants provided was that individuals would be there longer if they continued to the next rounds.

536.     Defendants BM and MTV arranged air transportation and lodging for Plaintiff to travel to NYC to participate as a semi-finalist in the series MTB2.

537.     Defendants BM and MTV also arranged ground transportation via 15 passenger vans.

538.     Auditions in NYC were all day from approximately 9 am- 9pm.

539.     Approximately fifty individuals performed for Defendant Diddy at the NYC audition.

540.     During the days Plaintiff was not auditioning she was still required to come back and wait.

541.     While waiting at the audition Plaintiff's and contestants were not provided food and were not allowed to leave for any reason, including to get food.

542.     During the initial auditions in NYC, contestants would perform for Defendant Diddy and then just wait without knowledge if they advanced to the finalist round. The auditions went on for several hours and included several rounds. Contestants were not allowed to leave.

543.     At the end of the NYC initial auditions, Plaintiff was told that they were being sent home because Defendant Diddy wanted to search for additional talent. Before Plaintiff was released she was required by Defendants BM and MTV to sign a general release for her likeness to appear on television.

544.     Plaintiff was required to sign the contract with Defendants BM and MTV before she left NYC.

545.     Plaintiff was told she was required to sign this contract in order to be considered for further consideration on MTB2.

546.     Plaintiff was not allowed to take the contract home. Plaintiff was not allowed to have a professional review the contract for its content and was told it needed to be signed immediately on the spot.

547.     Plaintiff does not remember or believe if Defendants BM and MTV offered compensation for this release.

548.     Plaintiff returned home for approximately a month before being called again by Defendants MTV and BM where she was told she had been selected to appear as a one of the thirty finalist.

549.     Defendants MTV and BM then arranged for Plaintiff to travel back to NYC from Detroit to participate in another audition process to choose the members of the group.

550.     Out of the thirty individuals called back as finalist, twelve would be selected for final consideration to become members of the group.

551.     Once Plaintiff was chosen to be one of the twelve contestants to move into the house, Defendants BM and MTV presented a second, longer, contract to be signed by Plaintiff for further participation in MTB2 and consideration to be part of the group.

552.     This second contract was upwards of thirty plus pages. Plaintiff was again required to sign this contract immediately and on the spot in order to advance to the next round and move into the house.

553.     Defendants BM and MTV prevented Plaintiff from reviewing or having anyone review contract presented. Defendants made it clear if participants, including Plaintiff, did not sign contracts immediately on the spot, then would have to go home and terminated from further consideration on MTB2.

554.     Plaintiff signs a third contract during MTB2 Season 3. Plaintiff believes this contract was a record deal with Defendants Diddy and BBE.

555.     Plaintiff was also unable to review this contract and was forced to sign it under duress.

556.     Defendant Mickey made false representations that if Plaintiff did not sign the agreement immediately on the spot that none of the other group members would be paid.

557.     The contract Plaintiff was forced to sign due to Defendant Mickey's false representations was a contract binding Plaintiff to terms of a future contract that Plaintiff had not seen, negotiated or been presented a copy to review.

558.     Plaintiff signed a fourth contract during Season 3 of MTB2 with Defendants Janice, JCP and JCPH.

559.     Plaintiff specifically felt pressured into signing with Defendants Janice, JCP and JCPH because Plaintiff desired to sign with other publisher SESAC, and believed a conflict existed with Defendant Janice and her companies because she is Defendant Diddy's mother.

560.     Plaintiff ultimately signed with Defendants Janice, JCP and JCPH because she was not given a choice and was outvoted by her bandmates 5-1. Further, Defendant Diddy made it known if Plaintiff did not sign the group would not continue.

561.     Plaintiff received a one-time payment for this agreement with Defendants Janice, JCP and JCPH in an amount no more than $25,000.

562.     Plaintiff has no access to her copyright information nor does she have any other information related to her works because of the interference by Defendants Janice, JCP and JCPH.

563.     Plaintiff was never provided an executed copy of any of the contracts she signed.

564.     Plaintiff was forced to sign all contracts immediately, on the spot, without opportunity to review herself or to have it reviewed by a professional. There was never any negotiations nor meeting of the minds in any contract.

565.     Plaintiff does not recall receiving compensation by Defendants BM and MTV for her participation and appearance on three seasons on the television show MTB2.

566.     Further, due to the actions of Defendants BM, MTV, Diddy and Phil Plaintiff was precluded from the opportunity to negotiate an appearance or participation fee for Plaintiff's appearance and participation in MTB2 Seasons 2 and 3.

567.     Plaintiff's spouse and children also appeared on the show MTB2. All appearances by Plaintiff's family were not compensated and Plaintiff was responsible for transportation expenses.

568.     The only compensation Plaintiff recalls receive while filming every season of MTB2 was a per diem, in cash of a couple hundred a week which was provided by a production assistant of Defendants BM and MTV. The per diem was to cover food for the week. Since Plaintiff does not have any copies of her contracts she cannot be certain what if any compensation she received while filming MTB2.

569.     Plaintiff believes Defendants BM, MTV, Diddy and BBE intended to exploit individuals like Plaintiff who had a desire and dream to be recording artist in the music industry and made false promises of stardom to Plaintiff that she would become a successful recording artist by participating in this show and becoming a member of the group.

570.     It is important to note that NONE of the individuals picked to participate in any of the three groups formed during the nine seasons Defendant Diddy controlled the MTB franchise have ever had a music career outside of Defendant Diddy.

571.     Defendant Diddy has seemingly blackballed the members of the MTB franchise from any career in music, specifically Plaintiff and the MTB2 group.

572.     The debut album of Plaintiff's group "Too Hot for TV" was certified gold.

573.     When the album went gold, Defendant Diddy threw a party for the group to celebrate the achievement. While at the party the only person presented a plaque was Defendant Diddy. At a later date and time Plaintiff had to purchase her own plaque.

574.     Plaintiff believes that the only reason the album did not go Platinum was because it was under shipped by Defendant UMG.

575.     During Season 3 of MTB2 group members complain about being unable to find the album in stores.

576.     Due to the under shipping by Defendant UMG, the album was bootlegged therefore driving down sales that would have been made had an adequate amount of albums been shipped.

577.     Upon information and belief, Defendants BM, MTV, Viacom, Paramount and Diddy made approximately $30 million from the MTB2 television program.

578.     Upon information and belief, Defendants Diddy, BBE, SJC, BBEH, Janice, JCP, and JCPH made approximately $50 million from the musical act "Da Band."

**Defendant Diddy Controls the Group's Decisions**

579.     After Plaintiff and the group moved into their residence in Season 2 they were introduced to Defendant Dofat, who Plaintiff met for first time.

580.     Defendant Dofat was assigned by Defendants Diddy and BBE to producer the groups debut studio album.

581.     Plaintiff, nor anyone in the group, consulted with or hired Defendant Dofat for production services.

582.    After meeting Defendant Dofat, an individual who was not hired by Plaintiff or her group members, Plaintiff then met Defendant Fonzworth.

583.    Plaintiff was told Defendant Fonzworth would be moving into the house acting as a tour manager, despite their being no tour.

584.    Plaintiff was not consulted nor did she have any decision in hiring Defendant Fonzworth.

585.    Plaintiff, nor anyone in her group, consulted, hired or contracted with Defendant Fonzworth for services.

586.    Despite having no contract with Plaintiff or the group, and the fact he had not auditioned or been chosen as a member of the group, Defendant Fonzworth appears on Da Band's album "Too Hot for TV."

587.    Plaintiff did not consent nor agree to Defendant Fonzworth appearing on Plaintiff's group album "Too Hot for TV."

588.    Plaintiff believes Defendant Fonzworth was compensated with proceeds rightfully belonging to Plaintiff for his appearance on Plaintiff's group album "Too Hot for TV."

589.    After meeting Defendant Fonzworth, Plaintiff and her group members, later met Defendant D.Dot.

590.    Plaintiff was told Defendant D.Dot would be assisting the group with creating an album, thought his exact purpose was vague.

591.    Plaintiff was not consulted nor did she have any decision in hiring Defendant D.Dot.

592.    Plaintiff, nor anyone in her group, consulted, hired or contracted with Defendant D.Dot for services.

593.        Despite having no contract with Plaintiff or the group, and the fact he had not

auditioned or been chosen as a member of the group, Defendant D. Dot appears on Da

Band's album "Too Hot for TV."

594.        Plaintiff did not consent nor agree to Defendant D.Dot appearing on Plaintiff's

group album "Too Hot for TV."

595.        Plaintiff believes Defendant D.Dot was compensated with proceeds rightfully

belonging to Plaintiff for his appearance on Plaintiff's group album "Too Hot for TV."

596.        During Season 2, while Plaintiff and the group were interviewing managers,

Defendant Lou was presented as a potential person to interview for management.

597.        Defendants BM and MTV concealed the fact Defendant Lou was the creator of

the MTB franchise.

598.        Plaintiff and the group did not ask to interview Defendant Lou and did not

consider him a viable candidate because of his seedy reputation that was well known.[48]

599.        Plaintiff attempted to bring her attorney, Mr. Hertz, to serve as manager. Mr.

Hertz interviewed with the group for management.

600.        Plaintiff offered Mr. Hertz as a management candidate because she did not agree

with Defendant Phil managing the group. Plaintiff believed it was a conflict of interest

for Defendant Phil to manage them because he already managed Defendant Diddy and

Plaintiff believed Defendant Phil's loyalty would fall to Defendant Diddy because he

only was provided the opportunity to work in the music industry due to his college

friendship with Defendant Diddy.

---

[48] Defendant Lou was subquently convicted to 25 years in prison for various crimes related to his scam involving his boy band groups in the music industry. Defendant Lou died an inmate in federal custody in 2016. A fate Defendant Diddy is currently facing.

601.    Despite the group interviewing managers, Defendant Phil had already been acting in that role.

602.    Plaintiff was forced to deliver the news on MTB2 that the group had chosen Defendant Phil as the manager. Plaintiff feels that Defendants BM, MTV, Diddy and BBE forced her to deliver the news to contest any future claims Plaintiff might advance regarding the obvious conflict of interest Defendant Phil presented managing both Defendant Diddy and the group.

603.    Plaintiff felt continuous pressure to conform to the whims of the group as she was constantly outnumbered 5-1 because the other five group members blindly trusted Defendant Diddy and the representations of his employees and agents.

**Defendant Diddy Intimidates, Threatens and Fosters a Hostile Work Environment**

604.    Defendants BM and MTV would film Defendant Diddy making physical threats to group members. Defendant Diddy threatened to eat the face of one person and kill another.

605.    Defendant Diddy was often times yelling and ridiculing Plaintiff, especially during times Plaintiff sought him out to redress issues she was facing in the group.

606.    The aggressive and abusive behavior, constant threats made by Defendant Diddy and the lack of response from Defendants BM and MTV made Plaintiff reasonably fear for her safety.

607.    Plaintiff was terrified to disappoint or upset Defendant Diddy due to his behavior and constant threats of violence.

608.    Plaintiff was subject to constant physical altercations throughout filming all three seasons of MTB2.

609.    Defendants BM and MTV would not intervene during any of the fights. In one particular instance Plaintiff was in the direct path of a fight which she was almost injured.

610.    After fights would occur, Defendant Diddy would ask his staff and staff of Defendants BM and MTV's crew who won the fight.

611.    Defendant Diddy encouraged fighting, physically and verbally, and often times instigated division to foster a negative environment that would lead to fighting.

612.    In Season 3, Defendant Diddy yells "fight, fight" and says "finally a fight" describing a verbal altercation between Plaintiff and another, male, group member.

613.    Upon information and belief, Defendants Diddy, BM, MTV and BBE encouraged fighting and hostility to manufacture drama for the MTB television show.

614.    Another example of manufactured drama was when Plaintiff's child was sick and she needed to visit her child. Instead of Defendant Jason presenting the solution of arranging for Plaintiff to see her child after their tour performance, which he did eventually, Defendant Jason caused conflict by informing Plaintiff's bandmates that Plaintiff just wanted to go home, without context or circumstances, in an effort to fabricate conflict where it should have been none.

615.    Another example of manufactured drama and hostile working conditions was when Plaintiff was contacted to do an editorial appearance in King magazine.

616.    Defendants BM, MTV, Diddy and BBE edited the MTB2 television show to make it appear that Plaintiff made the arrangements do be in King magazine behind the group's back to promote herself as a solo artist.

617.    What actually occurred is after the group's album listening party, Defendant King approached Defendants Diddy and BBE to do an editorial piece on Plaintiff.

618.     Defendants Diddy and BBE acquiesced to Defendant King's request to garner

press and promotion for the group's debut album "Too Hot for TV."

619.     Plaintiff was required to appear in the King magazine at the behest of Defendant

Diddy.

620.     Defendant Diddy had creative control over Plaintiff's King magazine appearance

and made every effort to paint Plaintiff as an oversexualized vixen and sex object.

621.     Plaintiff was accompanied by an employee of Defendants Diddy and BBE during

her King magazine photo shoot.

622.     Defendant Diddy called the employee to determine Plaintiff's performance at the

photo shoot.

623.     Aware of this, Plaintiff wanted to do a good job at the photoshoot and complied

with all requests made by Defendant King's employees including a request to remove her

top, something Plaintiff did not want to do and otherwise would not have done.

624.     Plaintiff's appearance in the magazine was so popular she was asked to appear in

it again.

625.     Plaintiff was never compensated by Defendants Diddy, BBE or King for either

appearance in the publication.

626.     Upon information and belief, Defendants Diddy, BBE and King greatly benefited

financially from the appearance of Plaintiff in King magazine.

627.     After Plaintiff's successful appearances in King Magazine, Defendant Jason then

presented Plaintiff with the offer that was received requesting her to do Playboy.

628.     Plaintiff adamantly refused the request to appear in Playboy.

629.    Plaintiff believes her refusal to comply to appear in Playboy factored in Defendant Diddy's removal of her from the group and the label.

630.    Plaintiff believes she was terminated because she was constantly trying to review contracts, refused to do Playboy and refused Defendant Diddy's sexual advances

**Inhumane treatment, and Denial of Basic Needs by Defendants Diddy and MTV**

631.    While working for Defendants MTV, Diddy, BBE, and UMG, Plaintiff was subjected to Defendant Diddy's controlling behavior and outrageous demands including no eating after certain times. Defendant Diddy would prevent Plaintiff from eating until he said she could eat.

632.    Defendant Diddy controlled Plaintiff's sleeping schedule. Defendant Diddy expected Plaintiff to perform for him, regardless of the ungodly hour, at his command and behest. Defendant Diddy could demand such of Plaintiff because he unfettered access to Plaintiff's residence from Defendants BM and MTV.

633.    In the third season of MTB2, Plaintiff was forced to live with Defendant Diddy where he had further command of Plaintiff's eating and sleeping schedule.

634.    Plaintiff believed Defendant Diddy was residing in the same residence because she was told not to go upstairs because it was where Defendant resided.

635.    Plaintiff was not told that she would be residing in the same home with Defendant Diddy until she returned to NYC to film Season 3 of MTB.

636.    Plaintiff was extremely uncomfortable with having to live with boss but knew dare not complain because her other complaints had went unheard and she knew if she further complained about Defendant Diddy it would have dire consequences.

637.    Defendant Diddy controlled when the group could talk to each as he instructed them to be silent or not communicate with one another while they were being transported to various locations.

638.    When Plaintiff's returned to NYC for season 2, Defendants BM and MTV placed Plaintiff and the other five group members in a singular room with two twin beds as lodging accommodations.

639.    There was no reason for Plaintiff believed these would be her accommodations as when she auditioned as a semi-finalist the hotel rooms were two per person and the other person was the same sex.

640.    Plaintiff never anticipated upon her return to film season 2 she would be forced to share room with four men, as a married woman.

641.    Plaintiff was required to share the small hotel room, bathroom and living space with five other Indi duals plus camera crew.

642.    The hotel room chosen for Plaintiff and the group was dirty, nasty, small and intentionally chosen for its poor quality.

643.    Under information and belief, Defendants BM and MTV allowed Defendant Diddy to choose the accommodations, or lack thereof, for the group members.

644.    Under information and belief, Defendants BM and MTV allowed Defendant Diddy to choose these unreasonable accommodations for the exclusive purpose of manufacturing drama and hostile conditions to exploit for television ratings.

645.    Plaintiff was not allowed to seek alternate accommodations and was told that if she left or did not stay in the small hotel room with the other five group members she would not continue as a member of the group.

646.    To add insult to injury, Defendant Diddy forced Plaintiff to read Russell Simmons book at night, in the cold outside for several hours.

647.    Plaintiff was forced to learn rap songs "Rappers Delight" and "Juicy" verbatim before Defendant Diddy would allow the group to move out of the single hotel and into their residence.

648.    Plaintiff was subjected to uncompensated manual labor being forced by Defendant Diddy to wash cars, volunteer at a soup kitchen and finally, and most famously, force Plaintiff to walk to Brooklyn to get Defendant Diddy a cheesecake from Junior's restaurant.

649.    Once Plaintiff and the group members complied with Defendant Diddy's continuous outrageous demands they were finally allowed to move into the house.

650.    Defendant Diddy inhumanely evaluated Plaintiff's body and appearance, then mocked her about bulimia in front of several employees of Defendants MTV, BM, BBE and the entire world watching MTB2.

651.    Defendant Diddy made comments directed at Plaintiff about the album and tour process, saying the process would have people losing weight and getting divorces.

652.    Plaintiff believes Defendant Diddy directed these comments at her because he had so aggressively evaluated her physical appearance previously and because Plaintiff was the only member of the group who was married.

653.    Defendants BM and MTV subjected Plaintiff and other participants to hectic work conditions and forced physical labor which caused one individual to be hospitalized in season one, which was televised, and another individual to be hospitalized in season two, not televised.

654.     Plaintiff was never provided any schedule from Defendants BM, MTV, Diddy or

BBE while filming all three season of MTB2.

655.     Plaintiff was expected to be on call 24/7, with no knowledge of the day-to-day

filming or work schedule.

656.     Defendant Diddy would appear at all hours, randomly, and Plaintiff would be

expected to do whatever he requested.

657.     The only time any schedule was provided was by Defendant Alison, but it was

only for things like work outs with Defendant Chris or appointments at Defendant BBE's

offices.

658.     Due to the unpredictability of the schedule, constant on call nature of working for

Defendant Diddy and unreasonable working conditions, Plaintiff's body and voice

experienced significant strain and stress.

659.     Defendants BM and MTV always had the cameras rolling unless Diddy told them

not to.

660.     Plaintiff was subjected to being filmed 24/7, with no privacy and for no

compensation. Defendants BM and MTV had cameras and microphones in every room of

the home. Plaintiff and other contestants commonly referred to Defendants BM and MTV

as the "people in the stairs."

661.     One particular occurrence when Plaintiff thought she was alone at around 1 am,

Plaintiff begins doing facial exercises and oral affirmations only to discover cameras

intruding seconds later attempting to capture her actions.

662.     Filming of the ten-to-thirteen-episode seasons of MTB2 always occurred in NYC

and was for approximately one month's time.

663.    In addition to having to film a ten-to-thirteen-episode season of MTB2 Plaintiff also had to complete an album with her group, which normally takes one year to complete, within the one-month time of filming.

664.    While already having the clock work against them, Defendant Diddy would punish the group by shutting down the studio when group members would fight, giving Plaintiff and the group even less time than already provided.

665.    Plaintiff was forced to endure inhumane work conditions like having to participate in as many as one hundred interviews in a single day to promote the groups debut album "Too Hot for TV."

666.    Plaintiff had no decision in the scheduling of interviews and had no room to decline interviews scheduled.

667.    During the approximate one month of filming Season 3, Plaintiff and the group made approximately twenty tour stops. Upon information and belief Defendants Diddy and BBE were compensated between $80,000 and $250,000 for each tour stop.

668.    Despite the variance in payment for their performances, Defendant Diddy only paid Plaintiff and her group members a flat $5000 per show per person.[49]

669.    Defendant Diddy did not appear on any tour performance scheduled.

670.    Plaintiff, to date, has been unable to review the accounting nor has been provided adequate information for money Defendants Diddy and BBE were paid for their tour performances.

---

[49] Dawns lawsuit about 5k, seems like Defendant Diddy's favorite compensation amount is $5k.

671.     Plaintiff, to date, has been unable to review the accounting nor has been provided adequate information related to royalties paid to Defendant Diddy and BBE for the album "Too Hot for TV."

672.     Plaintiff, to date, has been unable to review the accounting nor has been provided adequate information related to the television show MTB2 from Defendants BM, MTV, Viacom or Paramount.

673.     Plaintiff, to date, has been unable to review the accounting nor has been provided adequate information related to copyrights from her original works on "Too Hot for TV" or the "Bad Boys II Soundtrack."

674.     While recording the group's second album, Plaintiff found it harder than first time around as her group members punished her because of disagreements the group was having with Plaintiff's spouse.

675.     As a result of the rift, Plaintiff only recorded a hook on one song on the group's sophomore album that was never released. Plaintiff has no knowledge of where that work is to date nor has any knowledge on the copyright or ownership of the work.

676.     At the end of filming season 3, Plaintiff was send home again under the impression the show was being edited for television. Plaintiff was contacted shortly after because Defendant Diddy required her presence with the group in NYC. Defendant BM and MTV arranged for her transportation back to NYC.

677.     Upon arrival in NYC, Plaintiff and the group met with Defendant Diddy at Defendant BBE's offices where they were told that Defendant Diddy was dismantling the group.

678.        After the meeting, Defendants BM and MTV did not continue to film Plaintiff and the group.

679.        Plaintiff never heard from Defendants BM, MTV or BBE after that day.

**Plaintiff's Legitimate Concerns Go Ignored**

680.        Defendants Diddy, BBE MTV, or BM did not provide any human resources departments where Plaintiff could advance an employee grievance.

681.        Plaintiff complained to Defendants Diddy, MTV, BM, and Fonzworth her desires to leave due to the conditions of filming, the outrageous 24/7 on call work schedule and Defendant Diddy's outrageous demands and irrational behavior on multiple occasions.

682.        Plaintiff constantly attempted to have her grievances addressed as the conditions were affecting her body, voice, mental well-being and sense of peace.

683.        One such issue was group members were allowed to smoke both weed and cigarettes inside their residence and recording studio in extreme close proximity to Plaintiff.

684.         Group members were allowed to smoke both weed and cigarettes during working hours, on business property, despite Plaintiff's constant complaints about how the smoke affected her health and well-being and despite the fact weed was illegal at the time.

685.        All five of the group members smoked either weed or cigarettes so Plaintiff got no reprieve from the constant smoking. While Plaintiff was in the studio with the group it would become consumed with so much smoke Plaintiff would have to exit for fresh air.

686.        All of Plaintiff's pleas to her Defendant superiors about the smoke went unheard, were denied and constantly rejected.

687.    However, when Plaintiff and the group joined Defendant Diddy for a hosting in DC, Defendant Diddy made the members of the group who were smoking exit the tour bus and forced them to ride on another tour bus.

688.    When Defendant Diddy did not want smoke around him he addressed the issue immediately, when Plaintiff did not want smoke around her she was mocked by Defendant Diddy and told "womp, womp."

689.    Plaintiff attempted to redress her other grievances to Defendants BM, MTV, BBE, Phil, Diddy, Fonzworth and Dofat about group members refusing to work with her on their album. Plaintiff's grievances went ignored, unheard and at times she was mocked by Defendant Diddy told she needed to "toughen up" because she dared to air such grievances.

690.    Due to Defendant Diddy's unreasonable demands and expectations, Plaintiff was forced to be a workaholic to not draw the ire and wrath of Defendant Diddy, causing her severe physical and mental harm.

691.    Plaintiff attempted to redress other grievances to Defendants BM, MTV, BBE, Phil, Diddy and Fonzworth about group members being disrespectful to her spouse when he called or came to the house to visit. These grievances went ignored and unheard as well.

**Defendant Diddy Prevents Plaintiff From Having a Career in Music**

692.    Defendant Diddy further interfered with Plaintiff's music career for several years after he dismantled Plaintiff's group "Da Band."

693.    Plaintiff had meetings with several record labels and producers which all started off well, but then never materialized after the initial meeting.

694.     Plaintiff had an offer for a record deal with Capital Records. Plaintiff was told Defendant Diddy interfered and personally called executives at the label telling them not to sign Plaintiff.

695.     Plaintiff had an opportunity to sign a record deal with Elektra Records. The executive who extended the deal told Plaintiff that she needed to make a phone call before formally offering Plaintiff the deal. After that call Plaintiff was told that Elektra would have to pass on Plaintiff.

696.     Plaintiff, upon information and belief, believes it was Defendant Diddy who told the executive not to sign Plaintiff to Elektra.

697.     Plaintiff had another opportunity with Empire Records.

698.     The initial meeting went great like all the other meetings with record labels before. About a week after the initial meeting, the executive for Empire stated that they could not move forward with Plaintiff because the label was in the process of signing Defendant Diddy's son, King Combs, to a record deal and Defendant Diddy did not want his son being on the same label as Plaintiff.

699.     Defendant Diddy's son, King Combs, subsequently did sign a deal with Empire Records.

700.     Plaintiff had several meetings with producers and music industry executives in California but all of those meetings ended after Defendant Diddy interfered.

701.     On one occasion a producer was working with Plaintiff in the studio and abruptly exited the studio session because Defendant Diddy called him and told him to stop working with Plaintiff.

702.     Defendant Shawn told Plaintiff and the group, right before Defendant Diddy

dismantled the group, that they should get music out of their system because no one

would go against Defendant Diddy for them, and truer words had never been spoken.

**Defendant Diddy Sexually Harasses, Assaults and Falsely Imprisons Plaintiff**

703.     During filming of MTB2, Defendant Diddy took the group on a hosting he had in

DC.

704.     During this trip Defendant Diddy made a cocktail for Plaintiff but drank from the

cocktail first before giving it to Plaintiff.

705.     Plaintiff did not drink the cocktail Defendant Diddy made, drank from first and

gave her.

706.     Defendant Diddy proceeded to stare down Plaintiff for several minutes seemingly

observing if she would drink the cocktail.

707.     Plaintiff felt Defendant Diddy was trying to intimidate her into drinking the drink

so she eventually stopped looking in his direction.

708.     Shortly thereafter, Defendant Diddy leaves the main area of the tour bus to retreat

into his bedroom where he slams door. Plaintiff believes he did this in frustration because

she would not drink from the cocktail he provided her.

709.     Defendant Diddy would complain that the group members lacked drive and

initiative because they did not come to studio, Defendant Daddy's House, to record.

710.     Plaintiff, attempting to head the advice, went on her own to the studio to record.

711.     Plaintiff went on her own because the group had ostracized her and refused to

work with her.

712.    While Plaintiff was walking down hallway approaching Studio A, a lounge room that was used in filming MTB2, Defendant Diddy bursts out a door.

713.    Near the door to Studio A, is a cubby hole in corner near door.

714.    Plaintiff believes Defendant Diddy saw her walking through the hallways via security camera.

715.    Defendant Diddy backs Plaintiff up against corner and puts his right arm up to block Plaintiff from moving.

716.    Defendant Diddy then comes close enough to Plaintiff's face where he could kiss her and asks her in a low, sensual voice how she is doing, if she's ok and if she needed anything at all.

717.    While asking Plaintiff if she needed anything, Defendant Diddy used his left hand to adjust collar of her jacket and then ran his left hand across her breasts, while repeating the phrase if she needs anything to let him know.

718.    Plaintiff thought about trying to make a getaway under Defendant Diddy's right arm but was frozen in confusion and fear.

719.    Defendant Diddy, realizing Plaintiff is uncomfortable and not consenting to his actions removes his right arms that was precluding Plaintiff's movement. Defendant Diddy then went back inside Studio A.

720.    Plaintiff walked as fast as she could away from Defendant Diddy and out the studio.

721.    Plaintiff left so quickly in shock and disbelief that he assaulted her at the studio that she never recorded music that day.

722.    Plaintiff was extremely upset that Defendant Diddy assaulted her.

723.    Plaintiff has had to seek extensive therapy to deal from the turmoil inflicted from her experiences with Defendant Diddy and MTB2.

**Unjust Enrichment of Defendants by Breach of Contract and/or Copyright Infringement**

724.    As a member of Da Band, Plaintiff has composed and performed on over eight songs on the album "Too Hot for TV" and two songs used as theme songs for Season 2 and 3 of MTB2. Despite being the original composer on these works Plaintiff has no knowledge nor has ever received any composition rights or credits to those works. Defendants Diddy, BBE, Janice, JCP, and JCPH have failed to account to or pay Plaintiff for her compositions and her performances, have breached contracts and infringed on her copyrights, all of which has unjustly enriched Defendants.

725.    As a member of Da Band, Plaintiff has composed performed one song on the Bad Boys II Soundtrack. Despite being the original composer on these works Plaintiff has no knowledge nor has ever received any composition rights or credits to those works. Defendants Diddy, BBE, Janice, JCP, and JCPH have failed to account to or pay Plaintiff for her composition and her performance on the soundtrack, have breached contracts and infringed on her copyrights, all of which has unjustly enriched Defendants.

726.    Plaintiff believes she was fraudulently induced to sign over her copyright ownership to Defendants Janice, JCP and JCPH so that Defendant Diddy could control its assignment to others, including himself.

727.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, wages, benefits, royalties, promotional fees, touring fees and other compensation. Plaintiff has also suffered, among other things, future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of

life, post-traumatic stress disorder, anxiety disorder, insomnia, panic attacks and other

non-pecuniary losses entitling her to an award of compensatory and punitive damages,

injunctive and declaratory relief, attorney's fees and costs, and other remedies as this

Court may deem appropriate.

### FIRST CAUSE OF ACTION
**Conduct and Participate in a Rico Enterprise Through a Pattern of Racketeering Activity a Violation of Racketeer Influenced and Corrupt Organization Act, Codified at 18 U.S.C. § 1962(A), (C)-(D) (Against ALL Defendants)**

728.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

729.    Defendants ("RICO orchestrators") are 100% liable for the actions of Defendant Diddy. Defendants financially benefited through their partnership with Defendant Diddy. The RICO orchestrators provided Defendant Diddy with unfettered access to resources and failed to adequately investigate, supervise, and or monitor how those resources were being used, who was using those resources and the purpose of use of those resources.

730.    The support provided by the RICO orchestrators to Defendant Diddy was a lifeline that spearheaded and maintained the Defendant Diddy's depraved actions. Upon information and belief, the establishment of a business relationships with prominent businesses including Paramount, Viacom, MTV, UMG, BM, King and Does allowed for a distribution platform for all Defendant Diddy's business endeavors to disguise his true intentions with overly broad and vague in nature description of activities. Defendants knew or should have known that Defendant Diddy had no intention to utilize the resources he received for business related purposes and they did not put any mechanism in place to ensure that their resources, specifically their network, platform and

publication, were not being used for any illegal activity. Defendants' willful blindness resulted in Plaintiff suffering the harm detailed herein.

731.    Defendants are individuals and entities within the meaning of "person" as defined in 18 U.S.C. § 1961(3) because each is capable of holding, and does hold, "a legal or beneficial interest in property." The RICO orchestrators association was composed of Defendants Diddy, BBE, Harve, Tracy, Alison, Chris, Devyne, Norma, Fonzworth, Dofat, Mickey, D.Dot, Jason, Phil, Shawn, Daddy's House, UMG, UMG Distribution, Janice, JCP, JCPH, SJC, Paramount, Viacom, MTV, Jackie, Lou, BM, King and Does.

732.    In the relevant part, 18 U.S. Code 1961 defines a racketeering activity as:

(1) (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, ***dealing in obscene matter,*** or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... *section 933 (relating to trafficking in firearms)*, section 1341 *(relating to mail fraud)*, ***section 1343 (relating to wire fraud)***, ***sections 1461–1465 (relating to obscene matter), section 1511 (relating to the obstruction of State or local law enforcement)***, sections 1581–1592 *(relating to peonage, slavery, and trafficking in persons)*, ***section 1952 (relating to racketeering)***, *section 1956 (relating to the laundering of monetary instruments)*, (D) any offense involving fraud connected with a case under title 11...the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical.

733.    Section 1962(a) makes it: ***unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity*** or through a collection of an unlawful debt in which such person has participated as a principal within the meaning of Section 2, Title18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of

any interest in, or the establishment or operation of, any Enterprise which is engaged in, or the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a).

734.      Section 1962(c) makes it: **unlawful for any person employed by or associated with any Enterprise engaged in,** or the activities of which affect, interstate or foreign commerce, **to conduct or participate,** directly or indirectly, in **the conduct of such Enterprise's affairs through a pattern of racketeering activity.** 18 U.S.C. §1962(c).

735.      Section 1962(d) makes it: unlawful for **"any person to conspire to violate"** Section 1962(a) and (c), among other provisions. 18 U.S.C. § 1962(d).

736.      Defendants mentioned herein are associated with each other as an Enterprise within the meaning of "Enterprise" as defined in 18 U.S.C. § 1961(4).

737.      Plaintiff, in its pleading, has detailed acts by Defendants which are prohibited under 18 U.S.C. §1962.

738.      Defendants have unlawfully increased their profits by luring and deceiving individuals such as Plaintiff under false pretenses for Defendants' personal desires, deviances and gain.

739.      The RICO Enterprise activities affected interstate commerce, is comprised of an association of persons, including each Defendant and other unnamed co-conspirators herein. That association was structured by various agreements, deals, contracts, and non-contractual relationships between the Defendants, by which Defendants assumed different roles in knowingly and directly or indirectly participating in the acts necessary to carry out the directives of the Enterprise. As detailed herein, Plaintiff was a contestant on the television program MTB2.

740.    Defendant MTV and BM created the show with Defendant Lou. Plaintiff

participated as a contestant and group member for three season of MTB2 from 2002-

2004.

741.    Plaintiff was signed as a music artist to Defendant BBE and Bad Boy Records.

742.    While a music artist on Defendant BBE, Plaintiff made one studio album and

appeared on a blockbuster movie soundtrack.

743.    While a music artist on Defendant BBE, Plaintiff was required to sign over her

publishing to Defendants Janice, JCP, and JCPH.

744.    While an employee for Defendants Diddy, MTV, BM, BBE, and UMG, Plaintiff

was forced to work in extreme and hostile conditions.

745.    While an employee for Defendants Diddy, MTV, BM, BBE, and UMG, Plaintiff

was forced to sign contracts without the opportunity to review them or have them

reviewed by a professional.

746.    While an employee for Defendants Diddy, MTV, BM, BBE, and UMG, Plaintiff

was forced to endure harassment and sexual harassment from Defendant Diddy.

747.    While an employee for Defendants Diddy, MTV, BM, BBE, and UMG, Plaintiff

was not provided adequate accounting for the television show MTB2 and the album sales

from the albums "Too Hot for TV" and the "Bad Boys II Soundtrack."

748.    Plaintiff was induced to compete for a position in a group founded by Defendant

Diddy to be aired on Defendant MTV's network for the purpose of furthering the

Defendants RICO enterprise.

749.    Defendants all share a common purpose: to use deception, coercion, force, and the

threat of violence to enrich themselves at the expense of individuals like the Plaintiff. As

set forth herein, although all Defendants may not have directly threatened coerced, forced

or violently threatened Plaintiff, they financially benefitted from the scheme. It is

reasonable to believe Defendants would not have engaged in these acts of threats but for

the existence of the RICO scheme and their understanding that they would have

unfettered access to engage in their illegal and corrupt Enterprise without question.

750.    As evidenced in Plaintiff's complaint herein, Defendants all orchestrated,

participated, managed, and executed the RICO Enterprise.

751.    Defendants BM and MTV transported victims, including Plaintiff, on commercial

airlines to New York City to be participants in the television show MTB2 with Defendant

Diddy.

752.    The RICO Enterprise has functioned as a continuing unit and maintains an

ascertainable structure separate and distinct from the pattern of racketeering activity.

753.    This jurisdiction has criminally accused Defendant Diddy of engaging in

racketeering, and both cases have similar fact patterns and descriptions of racketeering

activities.

754.    Defendants disseminated their concealed scheme to Plaintiff in Michigan, and

other globally, though Defendant MTV's television network.

755.    Defendants disseminated their concealed scheme to Plaintiff in Michigan, and

other globally, though Defendant King's publication.

756.    Defendants BBE, MTV and BM provided a venue in which to carry out activities

to further the RICO Enterprise.

757.    The true nature of Defendants' Enterprise was left undisclosed, was omitted,

and/or was affirmatively misrepresented, all to fraudulently increase Defendants' profits,

at least some of which were used to expand the Enterprise, causing further injury to Plaintiff and possibly many others.

758.    Upon information and belief, Defendants profited from the Enterprise, and used the proceeds from the Enterprise to advance the Enterprise by funding and operating their marketing machine, including through the use of the mail, television coverage, word of mouth, and interstate wires to sell the illusion that Defendant Diddy was a serious and legitimate businessman who made regular people into music superstars.

759.    Defendants Diddy, BBE, Harve, Tracy, Alison, Chris, Devyne, Norma, Fonzworth, Dofat, Mickey, D.Dot, Jason, Phil, Shawn, Daddy's House, UMG, UMG Distribution, Janice, JCP, JCPH, SJC, Paramount, Viacom, MTV, Jackie, Lou, BM, King and Does were a direct participant in the marketing aspect of the scheme as it was Defendants BM and MTV who created the show idea, marketed the idea to potential contestants and paid for contestants to travel to participate on the show.  Defendants Harve, Tracy, Alison, Chris, Devyne, Norma, Fonzworth, Dofat, Mickey, D.Dot, Jason, Phil, Shawn, Jackie and Lou all appeared on the television show to further the enterprise and conceal their intentions from the participants. Defendant Janice, JCP and JCP ensured the enterprise owned any intellectual property produced by Plaintiff.

760.    Defendants BM and MTV provided the general public at large misrepresentative information, including over interstate television wireline communications systems via their television show MTB2.

761.    Upon information and belief, Defendants obtained revenue via wire transfers, documents, and banking transactions that were exchanged via electronic means over

interstate wires, thereby growing the Enterprise and causing further injury to Plaintiff as described throughout.

762.     Defendants' scheme was reasonably calculated to deceive Plaintiff of ordinary prudence and comprehension through the execution of their complex and illegal scheme to misrepresent the true purpose of Defendant Diddy's television show MTB2 that would lead to assault, battery or overall danger to Plaintiff. Plaintiff would have never engaged in any regard with Defendant Diddy if not but for the complex and illegal racketeering scheme operated by Defendants.

763.     Upon information and belief, Defendants each had the specific intent to participate in the overall RICO Enterprise scheme and each participated in the Enterprise as follows:

1. Upon information and belief, Defendants control and participate in the activities of the Enterprise in a variety of ways as set forth herein, including but not limited to, developing marketing campaigns to rebrand Defendant Diddy after his 2001 nightclub shooting trial to the general public.

2.  Upon information and belief, throughout the relevant period, Defendants Harve, Tracy, Alison, Chris, Devyne, Norma, Fonzworth, Dofat, Mickey, D.Dot, Jason, Phil, Shawn, Daddy's House, UMG, UMG Distribution, Janice, JCP, JCPH, Paramount, Viacom, MTV, Jackie, Lou, BM, King and Does entered into a partnership agreement with Defendant Diddy, SJC and BBE as general business partners, each member is responsible for the partners' actions in the partnership. Defendants have an ethical obligation to ensure their business partners were not using the partnership to engage in illegal activity.

3. Defendants Harve, Tracy, Alison, Chris, Devyne, Norma, Fonzworth, Dofat, Mickey, D.Dot, Jason, Phil, Shawn, Daddy's House, UMG, UMG Distribution, Janice, JCP, JCPH, SJC, Paramount, Viacom, MTV, Jackie, Lou, BM, King and Does provided resources to their general business partners, Defendants Diddy, SJC and BBE. Defendants Diddy, SJC and BBE used the resources provided by their general business partners to entice the public to want to audition for Defendant Diddy and watch the television show MTB2. Defendants Diddy and his coconspirators, relied on the mail, world wide web and telephone to disseminate the misleading information described herein. Defendants did not disclose to the individuals they solicited the fact that they would be exploited, harassed, abused, assaulted or battered while participating in the making of the band sponsored by and starring Defendants and their business.

4. Defendants Harve, Tracy, Alison, Chris, Devyne, Norma, Fonzworth, Dofat, Mickey, D.Dot, Jason, Phil, Shawn, Daddy's House, UMG, UMG Distribution, Janice, JCP, JCPH, Paramount, Viacom, MTV, Jackie, Lou, BM, King and Does authorized the resources to their general business partner, Defendant Diddy in furtherance of the goals of their conspiracy. Defendants used the television show MTB2 as a ruse to provide Defendants Diddy, SJC and BBE cover to disguise their covert RICO Enterprise. Throughout the relevant period, Defendants used their collective resources relying on the mail, email, radio and world wide web to disseminate the misleading information described herein. As the general business partner of Defendants Diddy, SJC and BBE, Defendants are equally liable for the commission of these acts.

5.  Defendants BM, MTV and BBE ensured cash payments to Plaintiff, were executed. Plaintiff does not recall receiving appropriate United States federal tax documents for payments or the value of the trip as if they independently declared these payments on their taxes. It is unclear if Defendants requested an audit of Defendant Diddy's business financial records to ensure the resources provided to Defendant Diddy was not being used to fund illegal activities.

764.  During the ten (10) years preceding the filing of this action and to the present, all Defendants did cooperate jointly and severally in the commission of predicate acts itemized at 18 U.S.C. §§ 1961(1), in violation of 18 U.S.C. 1962(d), as described in this Complaint.

765.  Beginning at an exact date unknown to Plaintiff, but within ten (10) years preceding the filing of this action, Defendants have knowingly, willfully, and unlawfully participated in a pattern of racketeering activity that continues possibly to this day.

766.  The "Racketeering Acts" followed the same pattern and purpose: to defraud the Plaintiff for the Defendants' benefit. Each Racketeering Act involved the same or similar methods of commission and participants.

767.  Defendants' business would not have succeeded without the repeated predicate acts and the ability to conduct their fraud using mail, telecommunications wires, interstate travel, and possibly money laundering.

768.  The Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate their businesses to solicit potential victims as detailed herein.

769.        The separate Racketeering Acts all relate to each other in that they were part of concerted actions by Defendants to use the endorsement and channels of the Enterprise to operate their businesses to fraudulently induce Plaintiff.

770.        Defendants' wrongful conduct has injured Plaintiff and continues to threaten Plaintiff and the public.

771.        Defendants' association with the Enterprise enabled Defendants to conduct, direct, and control a pattern of fraudulent, illegal activities over a substantial number of years, which continues to this day.

772.        To further their collective goals, Defendants worked in concert to engage in various forms of criminal activity at the direction and demand of Defendant Combs'.

773.        Defendant's ongoing racketeering activity has injured and continues to injure Plaintiff.

**Defendants Committed Multiple Acts of Mail Fraud in Violation of 18 U.S.C. § 1341 in Furtherance of the Enterprise**

774.        Defendants voluntarily and intentionally devised and participated in a scheme with the intent to defraud Plaintiff.

775.        Defendants used the mail to execute the fraudulent scheme herein.

776.        Specifically, the Defendants agreed to each of the acts of mail fraud described throughout this Complaint. In addition, they agreed to rely on the mail to distribute their marketing materials, contest instructions, secure wires and cash payments from other participants in the scheme.

777.        In furtherance of and for purposes of executing the above-described fraudulent and illegal course of conduct and scheme to defraud, Defendants, either individually or in

combination with themselves, used and caused to be used the U.S. mail by both placing

and causing to be placed, marketing materials, advertisements, agreements and other

matters in depositories and by removing, or causing to be removed, letters and other

mailable matters from depositories, in violation of the mail fraud statute, 18 U.S.C. §

1341.

778.    Defendants could not have furthered their fraudulent scheme without the use of

the mail. For example, without the mail, Defendants would be unable to conduct any

business relevant to its purposed creation. Defendants also required the mail to distribute

misleading advertisements to various states. For these reasons, the use of mail to conduct

fraudulent activity was necessary and inevitable.

### Defendants Committed Multiple Acts of Wire Fraud in Violation of 18 U.S.C. § 1343 in Furtherance of the Enterprise

779.    Defendants voluntarily and intentionally devised and participated in a scheme

with the intent to defraud Plaintiff.

780.    Defendants agreed to each of the acts of wire fraud described herein.

Additionally, Defendants agreed to rely on interstate wires to disseminate funds to others

in the Enterprise. Defendants illegally acquired and utilized wire transfers to further their

collective goal of furthering their RICO Enterprise.

781.    Defendants agreed that Defendants should facilitate these fraudulent purchases

over interstate wires in furtherance of the scheme.

782.    In furtherance of and for purposes of executing the above-described fraudulent

and illegal course of conduct and scheme or artifice to defraud, Defendants, either

individually or in combination with themselves, used, or caused to be used, interstate

wire communications to transmit or disseminate false, fraudulent, and misleading communications and information, in violation of the wire fraud statute, 18 U.S.C. § 1343.

783.     Defendants could not have furthered their fraudulent scheme without the ability to use telecommunications to share information with clients and retailers nationwide. Defendants needed to communicate with clients and retailers around the country, utilizing interstate telecommunications wires to conduct the fraudulent activity. Which was necessary and inevitable to use.

784.     Plaintiff has been damaged in her business or property because Defendants violated 18 U.S.C. § 1962(a), (c)-(d)), and, therefore, Plaintiff is entitled to recover the damages and other remedies enumerated therein.

785.     Defendants' acts or omissions were actuated by actual malice and a willful and wanton disregard for the consequences suffered by Plaintiff, were directed towards her because of her gender, and with knowledge of a high degree of probability of harm to Plaintiff and reckless indifference to the consequences of their acts or omissions.

786.     Compensatory damages alone will be insufficient to deter such conduct in the future. There needs to be a criminal referral to the United States Justice Department, as well as to the States Attorney General's Office.

**WHEREFORE,** Plaintiff requests that the Court issue an Order and grant Judgment to the Plaintiffs as follows:

- Grant Plaintiff statutory, common law, and punitive damages, and applicable pre- and post-judgment interest, in full recompense for damages;

- Enter judgment according to the declaratory relief sought;

- Grant Plaintiff such other and further relief, including, without limitation, injunctive and equitable relief, as the Court deems just in all the circumstances; and

- Grant Plaintiff an Incentive or Service Award reflective of the work done in prosecuting this action, the time spent, the effort and hard costs invested, and results obtained, in light of the Court's judgment informed by awards in other similar cases of comparable difficulty and complexity.

### SECOND CAUSE OF ACTION
**Assault and Battery**
**(Against Defendants Diddy)**

787.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

788.    As set forth above, Defendant Diddy did initiate nonconsensual contact with Plaintiff; did forcibly touch Plaintiff;; did intimidate and cause Plaintiff's safety and security to feel threatened; and did assault and sexually battery Plaintiff.

789.    In engaging in the conduct described herein, Defendant Diddy committed an assault against Plaintiff because he intentionally placed Plaintiff in reasonable apprehension of imminent harmful or offensive contact, and Plaintiff reasonably feared immediate bodily harm as a result of Defendant's conduct. Defendant's actions amount to violations under N.Y. Penal Law §§ 110/120.00(1), 120.15.

790.    Defendant made offensive bodily contact with Plaintiff, constituting harmful and offensive contact to Plaintiff's person. Said contact was done intentionally by Defendants and without Plaintiff's consent or legal justification.

791.    As alleged herein, Defendant acts against Plaintiff created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person. Said acts were done intentionally by the Defendant and without Plaintiff's consent or legal justification.

792.    As alleged herein, the Defendant's acts against Plaintiff constituted harmful and offensive contact to Plaintiff's person, which were done intentionally by the Defendant without Plaintiff's consent or legal justification.

793.    As alleged herein, Defendant's acts against Plaintiff created a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person. Said acts were done intentionally by Defendant without Plaintiff's consent or legal justification.

794.    Inasmuch as each Defendant was acting for, upon, and/or in furtherance of the enterprise, Defendants BM, MTV, Paramount, Viacom, BBE and SJC are liable under the doctrine of *respondeat superior* for the tortious actions of its Defendant actors.

795.    As a result of the foregoing, Plaintiff was caused to sustain physical, psychological and emotional injuries, pain and suffering, shame, embarrassment, humiliation, damage to reputation, has been caused to incur pecuniary losses, and was otherwise damaged.

796.    The conduct of Defendant Diddy described herein was willful, wanton, and malicious. At all relevant times, Defendant Diddy acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of

the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from

Defendant Combs according to proof at trial.

### THIRD CAUSE OF ACTION
**Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595**
**(Against Defendants Diddy, BBE, Bad Boy Records, UMG, BM, MTV, Viacom and Paramount)**

797.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

798.    Defendants knowingly obtained labor from Plaintiff through threats of serious

harm, physical restraint, and other means of coercion, in violation of 18 U.S.C. § 1589.

799.    Defendants Diddy, BBE, Bad Boy Records, BM, MTV, Viacom, UMG, and

Paramount knowingly benefited from the forced labor and the trafficking activities

conducted by Defendant Diddy.

800.    Under 18 U.S.C. § 1595, Plaintiff is entitled to bring a civil action against all

Defendants for their violation of 18 U.S.C. § 1589.

801.    As a direct and proximate result of Defendants' actions, Plaintiff has sustained

and will continue to sustain, monetary damages and/or economic harm, physical injury,

pain and suffering, and serious psychological and emotional distress.

802.    Plaintiff seeks compensatory damages for the harm suffered as a result of

Defendants' forced labor practices.

803.    Plaintiff also seeks punitive damages to deter such conduct by Defendants in the

future, along with reasonable attorney's fees and costs.

804.    Defendants' continuous threats, erratic behavior, coercion and interference with

Plaintiff's music career prevented Plaintiff from asserting her rights within the statutorily

proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## FOURTH CAUSE OF ACTION
### Battery/Sexual Battery
**(Against Defendants Diddy, BBE, Bad Boy Records, BM, Viacom, Paramount, MTV, SJC and JCP)**

805.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

806.     In engaging in the conduct described herein, Defendant Diddy committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person. Defendant Diddy, without consent, touched Plaintiff body including her chest area. Defendant's actions amount to violations under N.Y. Penal Law §§ 150.50, 130.52, 130.55, and 130.65.

807.     Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

808.     Defendant BM has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

809.     Defendant Viacom has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

810.     Defendant Paramount has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

811.     Defendant MTV has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

812.     Defendant SJC has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

813.     Defendant JCP has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy, the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

814.     As a direct and proximate result of Defendants' actions, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

815.     The described conduct by Defendant Diddy was willful, wanton, and malicious. At all relevant times, Defendant Diddy acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Defendant Diddy according to proof at trial.

816.     Defendants' continuous threats, coercion and interference with her career prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**FIFTH CAUSE OF ACTION**
**False Imprisonment**
**(Against Defendants Diddy, BBE, Bad Boy Records, Daddy's House)**

817.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

818.     Defendant Diddy falsely imprisoned Plaintiff in New York as alleged in this Complaint, by suddenly and without provocation, willfully and maliciously falsely imprisoned Plaintiff against her will in the Defendants' corporate recording studio Daddy's House for a prolonged period.

819.      Defendant BBE has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

820.     Defendant Bad Boy Records has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

821.     Defendant Daddy's House has financially and otherwise benefited from these acts and omissions by keeping Defendant Diddy the volatile and explosive owner of Bad Boy Records, satisfied, and benefited from facilitating his behavior.

822.     As a direct and proximate result of Defendants' actions, Plaintiff has sustained

and will continue to sustain, monetary damages and/or economic harm, physical injury,

pain and suffering, and serious psychological and emotional distress.

823.     Defendants' continuous threats, coercion and interference with Plaintiff's career

prevented Plaintiff from asserting her rights. Defendants should be estopped from

asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## SIXTH CAUSE OF ACTION
**Sexual Harassment, Gender Discrimination, and Hostile Work Environment Under New York State Human Rights Law, N.Y. Exec. Law §§ 290, et seq. ("NYSHRL")**
**(Against Defendants Diddy, BBE, Bad Boy Records)**

824.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

825.      Defendants Diddy, BBE and Bad Boy Records discriminated against Plaintiff on

the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate

treatment, verbal abuse, systematic exclusion, failure to address complaints of

discrimination and/or harassment, retaliation, derogatory gender-based slurs and

comments, insults and offensive gender-based language, intimidation and bullying,

threats, unfair treatment, and denial of opportunities, promotions, or benefits based on

gender.

826.     As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of the NYSHRL, Plaintiff has sustained and will continue to sustain,

monetary and/or economic harm, physical injury, pain and suffering, and serious

psychological and emotional distress.

827.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

828.     Defendants' continuous threats, coercion and interference with Plaintiff's career prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendant should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## SEVENTH CAUSE OF ACTION
**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y. Exec. Law §§ 8-101, et seq. ("NYCHRL")**
**(Against Defendants Diddy, BBE, Bad Boy Records)**

829.     Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

830.     Defendants Diddy, BBE and  Bad Boy Records discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to unwanted touching of her intimate parts and forcing Plaintiff to endure derogatory name-calling constituting a hostile work environment. Defendants engaged in a pattern of criminal conduct in the workplace that created an offensive, intimidating, and hostile atmosphere for Plaintiff based on her gender.

831.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

832.      Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

833.      Defendants' continuous threats, coercion and interference with Plaintiff's career prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

**EIGHTH CAUSE OF ACTION**
**Retaliation in Violation of New York State Human Rights Law, ("NYSHRL") Section 296**
**(Against Defendants Diddy, BBE, Bad Boy Records)**

834.      Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

835.      Plaintiff engaged in protected activity by rejecting Defendant's sexual advances, which constitutes opposition to unlawful sexual harassment under New York State Human Rights Law (NYSHRL), Section 296. This rejection is protected activity under NYSHRL as it opposes discriminatory conduct in the workplace.

836.      Defendants Diddy, BBE and Bad Boy Records' persistent denial of prominent or continuing singing/writing/performing roles as to Plaintiff constitutes adverse employment actions. Plaintiff's rejection of Defendant Diddy's sexual advances subjected her to an increasingly hostile work environment based on her gender. These actions materially and detrimentally affected Plaintiff's terms and conditions of employment and were in direct response to Plaintiff's protected activity of rejecting Defendant's sexual advances.

837.    Further, Defendants' failure to pay Plaintiff earned wages, royalties, and concert and promotional appearance fees according to contracts and other promises constitute adverse employment actions based on gender and were done in retaliation by Defendants.

838.    There is a direct causal connection between Plaintiff's protected activity and Defendants' adverse employment action. The timing and circumstances indicate Defendant's retaliatory motives.

839.    As a direct and proximate result of Defendants' retaliation, Plaintiff has sustained and will continue to sustain, monetary damages and/or economic harm, physical injury, pain and suffering, and serious psychological and emotional distress.

840.    Defendants' unlawful and retaliatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

841.    Defendants' continuous threats, coercion and interference with Plaintiff's career prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## NINETH CAUSE OF ACTION
**Violation of Right of Publicity Under New York Civil Rights Law § 50 and § 51 and Unjust Enrichment**
**(Against Defendants Diddy, BBE, Bad Boy Records, UMG, BM, MTV, Viacom, Paramount, Janice, JCP, JCPH, King)**

842.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

843.    Defendant Diddy required Plaintiff to perform at and attend numerous promotional events and interviews as part of MTB2's group "Da Band", including late or

overnight parties which were under contract between Defendant Diddy and Defendants MTV, BM, Viacom, and/or UMG.

844.    Defendants knowingly used Plaintiff's voice, likeness, image, and persona without Plaintiff's consent for advertising and promotion purposes and for the purpose of trade.

845.    Defendants have been unjustly enriched at Plaintiff's expense by using Plaintiff's voice, image, likeness, and persona without compensating Plaintiff.

846.    It would be inequitable for Defendant to retain the benefit conferred by the unauthorized use of Plaintiff's voice, image, likeness, and persona.

847.    As a result of Defendants' unauthorized use of Plaintiff's likeness, image, and persona, Plaintiff has suffered damages and is entitled to restitution in an amount to be determined at trial.

848.    Defendants' continuous threats, coercion and interference with Plaintiff's career prevented Plaintiff from asserting her rights. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## TENTH CAUSE OF ACTION
### Copyright Infringement, 17 U.S.C. § 106
**(Against Defendants Diddy, BBE, Bad Boy Records, UMG, BM, MTV, Viacom, Paramount, Janice, JCP, JCPH)**

849.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

850.    Plaintiff wrote, created and performed the music composition and sound recordings on the album "Too Hot For TV," the song "Why" on the Bad Boys II Soundtrack and two theme songs for the television show MTB2 Seasons 2 and 3.

851.     The compositions and recordings of the above were published by Defendants absent agreement on terms; thus, Defendants have no signed or enforceable agreement with Plaintiff. Plaintiff believes that Defendants Diddy BBE, Janice, JCP and/or JCPH registered the musical composition and sound recording pertinent thereto with the Register of Copyrights and received the certificate of registration therefor. Plaintiff is the rightful owner of the copyrights in the musical composition, rights of performance therein, and the exclusive rights to reproduce and distribute to the public by sale or other transfer of ownership, or by lease, lending or license, reproductions of the copyrighted works under Copyright Act, 17 U.S.C.§ 106.

852.     Plaintiff, upon information and belief, believes Defendants, and each of them, knowingly and willfully and without securing Plaintiff's permission or license: embodied, adapted, used, reproduced, marketed, distributed and sold Plaintiff's stolen copyrighted material on the Bad Boys II Soundtrack.

853.     Accordingly, Plaintiff alleges her claim for copyright infringement based on each Defendant's publication of Plaintiff's copyrighted musical composition without license, permission or approval and if such work was with a license that license was obtained fraudulently.

854.     Each Defendant unquestionably had access to Plaintiff's work through Defendants previous companies, Bad Boy Records, et al. or other of Defendants' holders of recorded compositions, and each Defendant knowingly and willfully ratified and confirmed said access thereafter.

855.     In undertaking the conduct complained of in this action, Defendants knowingly and intentionally violated Plaintiff's rights.

856.    At no time did Plaintiff authorize Defendants to use, license, own, reproduce, adapt or distribute Plaintiff's copyrighted material. At the times of the acts of infringement complained of, Plaintiff was and is the rightful owner of the copyright in the music composition identified and named above.

857.    After the respective dates of first publication and continuing to the present, the Defendants, and each of them, have infringed and continue to infringe Plaintiff's copyrights in the music composition by reproducing or causing, contributing to, and participating in the unauthorized reproduction of the copyrighted music composition and by causing, contributing to, and participating in the distribution of the unauthorized reproductions of the music composition as recorded to the public.

858.    Despite their actual or constructive knowledge through their individual and collective recording industry experience and knowledge of copyright laws, enforcement of intellectual property rights in other instances and their duties to view and examine licenses for uses of copyrighted works, Defendants have used and promoted and continue to use and promote, reproduce and to enable others to reproduce Plaintiff's copyrighted music composition in its complete or substantial entirety as and for the commercial profit of Defendants without any ongoing payment to or authorization by Plaintiff (i.e. no accountings have been received).

859.    As a direct and proximate result of the Defendants' knowing and willful infringing use of the copyrights, Plaintiff has sustained and will continue to sustain substantial injury, loss and damage to her ownership, publishing and performance rights in her music composition, which is copyrighted material.

860.    As a result of all of Defendants' joint, several, willful and deliberate acts of copyright infringement, Plaintiff is further entitled to recover from Defendants all of the damages sustained by Plaintiff permitted by federal copyright law, including but not limited to compensatory damages and the profits derived by Defendants as a result of their infringing acts, in an amount to be determined according to proof at trial.

861.    Plaintiff is further entitled to recover from Defendants the gains, profits and advantages Defendants, and each of them, have obtained as a result of their acts of copyright infringement.

862.    Plaintiff is entitled to the maximum statutory damages which copyright registration confers upon a copyright owner, pursuant to 17 U.S.C. §504(c), in the amount of $150,000.00 with respect to each Defendant for each work infringed, or for such other amounts as may be proper under 17 U.S.C. §504(c).

## ELEVENTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith & Fair Dealing
### (Against ALL Defendants)

863.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

864.    Plaintiff entered several contracts with Defendants, at least four.

865.     Plaintiff did all, or substantially all of the significant things the contracts required her to do.

866.    The allegations set forth in this complaint detail the malevolent and intentional behavior by Defendants, all of which constitute breaches of the implied covenant of good faith and fair dealing and demonstrate the bad faith of Defendants at all relevant times.

867.    Defendants did not pay Plaintiff as agreed.

868.    Defendants did not pay Plaintiff her royalties, nor extraneous promotions in any instance.

869.    Defendants did not pay Plaintiff her proper amount from touring.

870.    Defendants did not pay Plaintiff her proper amount from her television appearance for three seasons on the MTB2 television show.

871.    Defendants did not pay Plaintiff her share of income for her contributions to musical compositions, her publishing, despite the assignments to various companies.

872.    Not only have Defendants failed to pay Plaintiff, but they have also prevented Plaintiff from working in any capacity in the music industry and infringed her copyrights.

873.    Defendants' unfair interference with Plaintiff's right to receive the benefits of each contract was foreseeable in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages according to proof at trial.

874.    Defendants knew or could reasonably have foreseen that the harm and/or special circumstances were likely to occur in the ordinary course of events as a result of the breaches of Defendants' obligations to act in good faith, make Plaintiff's property productive and account for and pay Plaintiff as agreed. Accordingly, Defendants' conduct was a breach of implied covenant of good faith and fair dealing.

875.    As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, and has lost wages, benefits, and other out of pocket expenses.

876.    As an actual and proximate result of Defendants' aforementioned acts, Plaintiff has suffered physical injury and became mentally upset, stressed and aggravated. Plaintiff has experienced post-traumatic stress disorder, mental anguish, aggravation, anxiety,

humiliation, embarrassment, sleeplessness, loss of appetite, low self-esteem, depression, upset stomach, and other forms of extreme emotional distress. Plaintiff claims damages for physical injuries and mental distress in an amount according to proof at trial.

877.     The above-described actions were perpetrated and/or ratified by a managing agent, employee or officer of Defendants, and each of them. These acts were done with malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendants' future conduct.

878.     Defendants' continuous threats, coercion and interference with Plaintiff's music career prevented Plaintiff from asserting her rights within the statutorily proscribed period. Defendants should be estopped from asserting the statute of limitations as a defense due to the duress exerted upon Plaintiff.

## TWELFTH CAUSE OF ACTION
### Fraud / Intentional Misrepresentation / False Promise
### (Against ALL Defendants)

879.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

880.     Plaintiff asserts this cause of action against all Defendants.

881.     Defendants represented to Plaintiff that certain facts relative to payments to Plaintiff were true in each of the contracts above listed. Further, Defendants made multiple promises in verbally to Plaintiff which were captured and aired on the television show MTB2.

882.      Defendants' representations were false; Defendants did not intend to perform these promises when they were made or at any time.

883.    Defendants knew that their representations were false when they were made and they made such representations recklessly and without regard for the truth in such representations.

884.    Defendants intended that Plaintiff rely on their representations and promises.

885.    Plaintiff reasonably relied on Defendants' representations and promises.

886.    Defendants did not perform the promised acts.

887.    Plaintiff was harmed.

888.    Plaintiff's reliance on Defendants' representations and promises was a substantial factor in causing Plaintiff to suffer general, consequential and incidental damages, including economic damages according to proof at trial. Defendants knew or could reasonably have foreseen that the harm and special circumstances were likely to occur in the ordinary course of events as a result of the Defendants' breaches of contracts. Accordingly, Defendants' conduct was intentional misrepresentation.

889.    As an actual and proximate result of Defendants' intentional and unlawful misrepresentation and false promises, Plaintiff has lost wages, profits, benefits, royalties, and has incurred other out of pocket expenses.

890.    As an actual and proximate result of Defendants' fraudulent acts, Plaintiff has suffered physical injury and became mentally upset, stressed and aggravated. Plaintiff has experienced post-traumatic stress disorder, mental anguish, aggravation, anxiety, humiliation, embarrassment, sleeplessness, loss of appetite, low self-esteem, depression, upset stomach, and other forms of extreme emotional distress. Plaintiff claims damages for physical injuries and mental distress in an amount according to proof at trial.

891.     The above-described actions were perpetrated and/or ratified by a managing

agent, employee or officer of Defendants, and each of them. These acts were done with

malice, fraud, oppression and in reckless disregard of Plaintiff's rights. Further, said

actions were despicable in character and warrant the imposition of punitive damages in a

sum sufficient to punish and deter Defendants' future conduct.

892.     Defendants' continuous threats, coercion and interference with Plaintiff's music

career prevented Plaintiff from asserting her rights within the statutorily proscribed

period. Defendants should be estopped from asserting the statute of limitations as a

defense due to the duress exerted upon Plaintiff.

## THIRTEENTH CAUSE OF ACTION
### Negligent Hiring, Training, Supervision and Retention
### (Against Defendants BBE, Bad Boy Records, Combs Enterprises, UMG, UMG Distribution, SJC, BM, MTV, Viacom, Paramount, JCP, JCPH)

893.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as

if set forth fully herein.

894.     The offenses alleged herein resulted, in whole or in part, due to the failure of

Defendants to employ qualified persons for positions of authority, and/or to train and

supervise the conduct of such persons during their employment, and/or to promulgate

appropriate policies and procedures either formally or by custom properly or

conscientiously.

895.     Defendants were negligent in their hiring, training, retention, supervision,

direction, control, appointment and/or promotion of their employees, agents and/or

servants, including but not limited to each of the Defendants named herein.

896.     Defendants knew or should have known in the exercise of reasonable care the propensities of their employees and partners to engage in the wrongful conduct heretofore alleged herein.

897.     Defendants were negligent, careless and reckless in its screening, hiring, training, retention, supervision, direction, control, appointment and promotion of their agents, servants and employees in that said employees lacked the experience and ability to be hired by said Defendants; in failing to exercise due care and caution in their screening, hiring, appointment and promotion practices, and in particular, hiring individuals who lacked the mental capacity and ability to function on behalf of said Defendants; in that these individuals lacked the maturity, sensibility and intelligence to function on behalf of said Defendants; in that said Defendants knew of the lack of ability, experience and maturity of these individuals when they hired them; knew of the propensities of said individuals to act in the belligerent, aggressive, violent and illegal manner in which they did; in that said Defendants, their agents, servants and/or employees, failed to supervise, train, suspend and/or terminate these individuals when such action was either proper or required; and in being otherwise careless, negligent and reckless in the instance.

898.     The failure of the Defendants to adequately train its agents, servants an employees in the reasonable exercise of their job duties and the laws of the United States of America, is evidence of the Defendants' reckless lack of cautious regard for the rights of the public in general and Plaintiff in particular, and exhibited a lack of that degree of due care which reasonable and prudent individuals would show under the same or similar circumstances.

899.     Defendants knew or should have known in the exercise of reasonable care, the propensities of its agents, servants and employees to engage in the wrongful conduct heretofore alleged in this Complaint.

900.     Defendants knew or should have known that its policies, customs and practices, as well as its negligent hiring, retention, supervision, training, appointment and promotion of its agents, servants and employees, created an atmosphere where the most prominent offenders felt assured that their most brazen acts of abuse, misconduct, and neglect would not be swiftly and effectively investigated nor adverse employment action, or prosecution, taken.

901.     The mistreatment, abuses, and violations of Plaintiff's rights, as set forth above, were the reasonably foreseeable consequence of Defendants negligent conduct.

902.     The aforesaid acts and omissions of Defendants its agents, servants and employees, resulted in the Plaintiff's rights being violated and her being injured.

903.     As a result of the conduct complained of herein, Plaintiff suffered the damages alleged.

904.     As a result of the foregoing, Plaintiff is entitled to an award of compensatory damages, punitive damages, and reasonable attorney's fees, together with costs, expert fees, and disbursements.

## FOURTEENTH CAUSE OF ACTION
### Negligence
### (Against ALL Defendants)

905.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

906.    Each Defendant, inclusive of their agents, servants and employees, owed Plaintiff a duty of care, including the duty to prevent her from being harassed, assaulted, sexually assaulted and injured.

907.    Each Defendant, inclusive of their agents, servants and employees, breached their duty of care to Plaintiff.

908.    Each Defendant, inclusive of their agents, servants and employees, was negligent in the instance in that no reasonable person under the same or similar circumstances would have lured Plaintiff under false pretenses to be assaulted, harassed and injured.

909.    Each Defendant, inclusive of their agents, servants and employees, was negligent in the instance in that no reasonable person under the same or similar circumstances would have caused and/or allowed Plaintiff to be publicly humiliated, harassed, and sexually assaulted and injured.

910.    The negligence of each Defendant, inclusive of their agents, servants and employees, in the instance was the proximate cause of the injuries and damages suffered by Plaintiff.

911.    Inasmuch the Defendants were acting for, upon, and/or in furtherance of the RICO enterprise and/or within the scope of their employment, Defendants BBE, Bad Boy Records, Combs Enterprises, UMG, UMG Distribution, SJC, BM, MTV, Viacom, Paramount, JCP, JCPH, King are liable under the doctrine of *respondeat* superior for the tortious actions of same.

912.    As a result of the conduct complained of herein, Plaintiff suffered the damages alleged.

913.    As a result of the foregoing, Plaintiff is entitled to an award of compensatory

damages, punitive damages, and reasonable attorney's fees, together with costs, expert

fees, and disbursements.

### FIFTEENTH CAUSE OF ACTION
**The NYC Victims of Gender-Motivated Violence Protection Act**
**(Against ALL Defendants)**

914.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as

if set forth fully herein.

915.    The NYC Gender Motivated Violence Act revives any claims against "a party

who commits, directs, enables, participates in, or conspires in the commission of a crime

of violence motivated by gender has a cause of action against such party in any court of

competent jurisdiction." N.Y.C. Admin. Code § 10-1104.

916.    The herein described conduct of Defendants included fraudulently inducing

Plaintiff to participate in a nationwide search for a new band founded by Defendant

Diddy which was nothing more than a ruse to bring fresh victims for Defendants to

exploit and violate, sexually, which constitutes a "crime of violence" against Plaintiff and

is a "crime of violence motivated by gender" as defined in N.Y. C. Admin Code § 10-

1103. ("The term 'crime of violence' means an act or series of acts that would constitute

a misdemeanor or felony against the person as defined in state or federal law or that

would constitute a misdemeanor or felony against property as defined in state or federal

law if the conduct presents a serious risk of physical injury to another, whether or not

those acts have actually resulted in criminal charges, prosecution, or conviction," and

"The term 'crime of violence motivated by gender' means a crime of violence committed

because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

917.    Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

918.    Defendants' crimes of violence were motivated by Plaintiff's gender as defined in in the New York City Administrative Code § 8-903, as Defendant Diddy committed forcible sex acts upon Plaintiff that would constitute felonies under state law and as the conduct presents a serious risk of physical injury, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

919.    The Appellate Division has held that sexual assault is an act of gender-motivated violence under the law as "Coerced sexual activity is dehumanizing and fear-inducing. Malice or ill will based on gender is apparent from the alleged commission of the act itself. Animus inheres where consent is absent." *Breest v. Haggis,* 180 A.D.3d 83, 94 (App. Div. 2019).

920.    The described conduct herein of Defendant Diddy constitutes sexual offenses as defined in Article 130 of the New York Penal Law.

921.    Plaintiff is a woman, who is older than 18, who alleges misdemeanor and/or felony penal law violations, including but not limited to sexual misconduct (N.Y. Penal L. § 130.20), criminal sexual act in the first degree (N.Y. Penal L. § 130.50), criminal sexual act in the third degree ( N.Y. Penal L. § 130.40), forcible touching (N.Y. Penal L. § 130.52), sexual abuse in the first degree (N.Y. Penal L. § 130.65), and sexual abuse in the second degree ((N.Y. Penal L. § 130.60).

922.     Defendant Diddy cornered, prevented Plaintiff from movement and sexually assaulted Plaintiff while at his recording studio Daddy's House. Plaintiff could not be an unwilling participant and because she was unwilling Defendant Diddy retaliated against her by blackballing Plaintiff in the music industry.

923.     Defendant Diddy made a drink and drank from the drink before giving it to Plaintiff and demanded Plaintiff drink from it through his stare down.

924.     Defendants' actions presented a serious risk of physical injury to Plaintiff's person, regardless of whether or not those acts resulted in criminal charges, prosecution or conviction.

925.     Furthermore, Defendants BBE, Bad Boy Records, Combs Enterprises, UMG, UMG Distribution, SJC, BM, MTV, Viacom, Paramount, JCP, JCPH enabled Defendant Diddy's commission of the crimes of violence motivated by gender, and thus, are liable under the NYC Victims of Gender-Motivated Protection Act.

926.     Defendants enabled or participated in the assault, battery and harassment of Plaintiff because Defendants failed to, among other things, (1) protect Plaintiff from a known danger; (2) have sufficient policies and procedures in place to prevent sexual assault; (3) properly implement policies and procedures to prevent sexual assault; (4) take reasonable measures to ensure that policies to prevent sexual assault were working; (5) train their employees on identifying sexual assault and inappropriate workplace behaviors; (6) protect their employees from sexual assault; and (7) adhere to the applicable standard of care.

927.     Defendants enabled or participated in the assault, battery and harassment of Plaintiff because Defendants failed to timely and properly educate, train, supervise,

and/or monitor their agents or employees regarding policies and procedures that should be followed when assaults are suspected or observed.

928.    Defendants knew, or should have known, that Defendant Diddy was not fit to be in a position of authority. Defendants, by and through their agents, servants and/or employees, became aware, or should have become aware of Defendant Diddy's propensity to commit sexual assault and of the risk to Plaintiff's safety. At the very least, Defendants knew, or should have known, that they did not have sufficient information about whether or not their leaders, managers, and people were safe to be in positions of power.

929.    Defendants knew, or should have known, that Defendant Diddy posed a risk of sexual violence, assault, harassment and battery.

930.    Defendants failed to properly supervise Defendant Diddy and protect Plaintiff from a known danger, and thereby enabled Defendant Diddy's assault of Plaintiff.

931.    Defendants negligently deemed that Defendant Diddy was fit to be in a position of authority; and/or that any previous suitability problems Defendant Diddy had were fixed and cured; and/or that Defendant Diddy would not commit acts of sexual assault, battery, harassment or trafficking; and/or that Defendant Diddy would not injure others.

932.    Moreover, Defendants BBE, Bad Boy Records, Combs Enterprises, UMG, UMG Distribution, SJC, BM, MTV, Viacom, Paramount, JCP, JCPH facilitated the trafficking and assault of Plaintiff by actively maintaining and employing Defendant Diddy in a position of power and authority through which he had control over people, including Plaintiff.

933.     As a direct and proximate result of the aforementioned crime of violence and

gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary

damages, physical injury, pain and suffering, and serious psychological and emotional

distress, entitling her to an award of compensatory and punitive damages, injunctive and

declaratory relief, attorneys' fees and costs, and other remedies as this Court may deem

appropriate damages, as set forth in § 10-1104.

## SIXTEENTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### (Against ALL Defendants )

934.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as

if set forth fully herein.

935.     Defendants created an unreasonable risk of causing emotional distress to Plaintiff,

and Defendants knew or should have known that such conduct was likely to result in

emotional distress that might and/or likely would cause illness or bodily harm.

936.     Plaintiff's emotional distress was foreseeable to Defendants.

937.     As a direct and proximate result of the negligent conduct of Defendants,

specifically Defendant Diddy, Plaintiff suffered and will continue to suffer severe

emotional distress.

938.     Defendants conduct was wanton, malicious, willful, and/or cruel, entitling the

Plaintiff to punitive damages.

## SEVENTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (Against ALL Defendants)

939.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

940.     Defendants engaged in conduct toward Plaintiff that is extreme and outrageous to exceed the bounds of decency in a civilized society, namely by, *inter alia,* subjecting her to sexual assault, battery and misconduct.

941.     The sexual assault, battery and misconduct by Defendants were extreme and outrageous conduct that shocks the conscience.

942.     These actions were taken with the intent to cause or disregard for the substantial probability of causing severe emotional distress.

943.     As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

944.     Defendants conduct, specifically Defendant Diddy, was wanton, malicious, willful, and/or cruel, entitling the Plaintiff to punitive damages.

## EIGHTHTEENTH CAUSE OF ACTION
### Tortious Interference With Prospective Contractual Or Business Relations
### (Against Defendant Diddy)

945.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

946.      Plaintiff has had numerous opportunities to enter into contracts with prospective record labels, music executives and music producers in the music industry with prospective employees and consultants considering entering into agreements with Plaintiffs and with other prospective contracting parties.

947.    Defendant Diddy was made aware of such opportunities or at a minimum knew that Plaintiff actively pursued new contractual and business relations within the music industry.

948.    As set forth above, Defendant Diddy actively participated in inducing others in the music industry not to work with Plaintiff.

949.    As a result, the persons or classes of persons with whom Plaintiff had prospective contractual or business relationships were deceived or confused when determining if they would work with Plaintiff on her music career. In so, such persons or classes of persons have been and continue to be exposed repeatedly to false, derogatory, defamatory, negative and intentionally misleading "information" about Plaintiff and her abilities as a performer in the music industry.

950.    As set forth above, the actions of Defendant Diddy were intention and this negative referral of Plaintiff to others in the music industry was false.

951.    Defendant Diddy acted intentionally and with the sole purpose of harming Plaintiff by use of dishonest, unfair or improper means.

952.    As a result of such conduct, various record labels, producers and third parties in prospective contractual or business relations with Plaintiff suspended or terminated those relations, in one occurrence terminating those relations in the middle of a recording session.

953.    If not but for such tortious conduct of Defendant Diddy, those third parties would not have suspended or terminated those relations, which would have ripened into actual contracts or business relations.

954.     By virtue of such conduct, which includes tortious, intentional, malicious and/or criminal acts, Defendant Diddy interfered and continues to interfere with Plaintiff's prospective contractual or business relationships with record labels, music producers and other decision-making individuals in the music industry with whom Plaintiff and her businesses have such relations.

955.     As a result, Plaintiff has suffered damages to their prospective contractual or business relations.

956.     Defendant Diddy's tortious interference with Plaintiff's prospective contractual or business relations has damaged them in an amount to be determined at trial believed to be not less than $20 million.

957.     In addition to such damages, Plaintiff seeks punitive damages as a result of the egregious conduct committed by Defendant Diddy.

### NINETEENTH CAUSE OF ACTION
**Tortious Interference With Prospective Economic Advantage**
**(Against Defendant Diddy)**

958.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

959.     Defendant intended that his false and negative recommendation of Plaintiff would interfere with Plaintiff's ability to obtain future employment in the music industry, and/or knew that the false statements were substantially likely to interfere with Plaintiff's ability to obtain future employment in the music industry.

960.     Specifically, Defendant Diddy's false claims about Plaintiff were solely intended to pressure other music industry record labels or insiders to not work with Plaintiff, and/or to disrupt Plaintiff's ability to obtain any other comparable future employment.

961.     Defendant Diddy's actions and false statements did intentionally interfere with Plaintiff's ability to get employment in the music industry.

962.     The false statements made by Defendant Diddy were retaliatory because Plaintiff refused his sexual advances and made for the purpose for Plaintiff to lose other economic opportunities, including, but not limited to, multiple offers for a record deal with various record labels.

963.     As a proximate result of Defendant Diddy's intentional interference, Plaintiff has suffered the loss of salary, benefits, and additional amounts of money she would have received had Defendant not interfered. As a result of this intentional interference, Plaintiff has suffered such damages in an amount according to proof.

964.     As a further proximate result of Defendant Diddy's intentional actions, Plaintiff has been blackballed and unable to secure any work in the music industry since Defendant Diddy dismantled the group Plaintiff was a part of on national television on MTB2.

965.     Defendant's false statements and representation have further proximately caused Plaintiff to suffer shame and disgrace and continues, to suffer severe emotional distress from having her highly successful music career destroyed by a malicious and reckless campaign spearheaded by Defendant Diddy.

966.     The above-mentioned actions of Defendant Diddy were done with malice, fraud or oppression, and in reckless disregard of the Plaintiff's reputation and need to earn a living, and Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

## TWENTIETH CAUSE OF ACTION
### Negligent Interference with Prospective Economic Advantage
### (Against Defendant Diddy)

967.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

968.     Defendant knew, or should have known, that his false statements would interfere with Plaintiff's ability to obtain future employment in the music industry, and/or knew, or should have known, that his false statements were substantially likely to interfere with Plaintiff's ability to obtain future employment and reasonably probable economic benefit.

969.     Defendant had a duty to act with reasonable care prior to making its inflammatory statements against Plaintiff, so as to not injure Plaintiff's reputation, occupation and/or financial interests.

970.     Defendant failed to act with reasonable care when they made their false claims to various individuals in the music industry about Plaintiff, that Defendant did not take any reasonable steps to substantiate. Defendant also failed to exercise reasonable care when it included Plaintiff on a "hit list" of people that he intended to blackball in the music industry because Plaintiff rejected Defendant's sexual advances.

971.      Defendant wholly failed to provide even a scintilla of evidence or proof supporting any negative actions of Plaintiff.

972.     In failing to exercise reasonable care to verify the truth or falsity of any anonymous allegations, Defendant's false statements directly caused Plaintiff to not be able to secure any employment in the music industry.

973.     As a proximate result of Defendant's wrongful conduct, Plaintiff has suffered the loss of salary, benefits, and additional amounts of money she would have received had

Defendant not interfered. As a result of this intentional and/or negligent interference, Plaintiff has suffered such damages in an amount according to proof.

974.     As a further proximate result, Plaintiff has largely been unable to secure any work in the music industry since Defendant Diddy dismantled her group on national television.

975.     Defendant's false statements have further proximately caused Plaintiff to suffer shame and disgrace and she has, and continues, to suffer severe emotional distress from having her highly successful music career destroyed by a malicious and reckless campaign by Defendant.

**<u>TWENTY-FIRST CAUSE OF ACTION</u>**
**Tortious Interference with Existing Contractual or Business Relations**
**(Against Defendant Diddy)**

976.     Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

977.     Defendant Diddy through Defendants BM, MTV and BBE knew of the existing contractual or business relationships between the persons or classes of persons identified above and Plaintiff including without limitation of the existence of valid recording agreements and television appearances between Plaintiff and third parties.

978.     Defendant wrongfully terminated Plaintiff and transmitted numerous disparaging statements about Plaintiff to others interfering with her existing contractual relationships.

979.      As a result, the persons or classes of persons with whom Plaintiff had existing contractual or business relationships were deceived or confused. In so, such persons or classes of persons have been and continue to be exposed repeatedly to false, derogatory, defamatory, negative and intentionally misleading "information" about Plaintiff and her abilities to perform in the music industry.

980.    The statements made by Defendant Shawn on the television show MTB2 that the group members needed to "get music out of their life" because no one would go for them over Defendant Diddy came true for Plaintiff.

981.    With respect to Plaintiff's existing contracts with Defendants BM, MTV, BBE and JCP, Defendant Diddy intended to procure and improperly procured breaches of said contracts without justification.

982.    With respect to plaintiffs' existing business relations, Defendant Diddy acted intentionally and with the sole purpose of harming Plaintiffs using dishonest, unfair and/or improper means.

983.    As a result of such conduct, third parties in privity of contract or in existing business relations with Plaintiff suspended, breached or terminated contracts and suspended or terminated existing business relations with Plaintiff including the contracts Plaintiff had with Defendants BBE, Bad Boy Records, BM and MTV.

984.    There would not have been such suspension, breach or termination but for such conduct.

985.    By virtue of such conduct, which includes tortious, intentional, malicious and/or criminal acts, Defendant Diddy interfered and continue to interfere with Plaintiff's existing contractual or business relationships with music labels, music executives, music producers, press, other music industry insiders and other persons or classes of persons identified above with whom Plaintiff had such relations.

986.    As a result, Plaintiff has suffered damages to her existing contractual or business relations.

987.    Defendant's tortious interference with Plaintiff's existing contractual or business relations has damaged them in an amount to be determined at trial believed to be not less than $20 million.

988.    In addition to such damages, Plaintiff seeks punitive damages as a result of the egregious conduct committed by Defendant Diddy.

989.    As set forth above, Plaintiff entered into a contract with Defendants BM and MTV to appear on the television show MTB2, Defendants BBE and Bad Boy Records for a five-album recording contract, and Defendants Janice, JCP and JCPH for copyright and songwriter services which Defendant Diddy intentionally interfered with by conspiring to steal Plaintiff's copyrighted work and in retaliation for refusing Defendant's sexual advances.

990.    In doing so, Defendant Diddy was aware of the existence of the contracts and intended to procure and improperly procured its breach without justification.

991.    There would not have been such termination and/or breach but for the conduct of Defendant Diddy.

992.    As a result, Plaintiff has suffered damages by the loss of the contracts.

993.    Defendant Diddy's tortious interference with the contracts have damaged Plaintiff in an amount to be determined at trial believed to be not less than $20 million.

994.    In addition to such damages, Plaintiff seeks punitive damages as a result of the egregious conduct committed by Defendant Diddy.

## TWENTY-SECOND CAUSE OF ACTION
### Tortious Interference with a Contract
### (Against Defendant Diddy)

995.    Plaintiff incorporates by reference all preceding paragraphs and re-alleges them as if set forth fully herein.

996.    At the time all of the above-described actions of Defendant Diddy were made by he was aware that Plaintiff was employed with Defendants BBE, Bad Boy Records, BM MTV, JCP, and JCPH and his specific intent in engaging in his behavior was to get Plaintiff terminated.

997.    Defendants intentionally interfered with Plaintiff's music career by saying Plaintiff was difficult and caused drama were solely intended to disrupt the employment contract between Defendants above and Plaintiff. The actions and intentional interference of Defendant Diddy did in fact cause termination and breach of these contracts with Plaintiff.

998.    Defendant Diddy's real motivation for making false statements about Plaintiff and interfering with her existing contracts was to retaliate against her for rejecting Defendant Diddy's sexual advances.

999.    Defendant Diddy's statements were always categorically false and Defendant has never provided any corroborating evidence to support his false claims about Plaintiff.

1000.    As a proximate result of Defendants' intentional interference, Plaintiff has suffered the loss of salary, benefits, and additional amounts of money she would have received had she not been terminated. As a result of this intentional interference, Plaintiff has suffered such damages in an amount according to proof.

1001.    As a further proximate result, Plaintiff has largely been unable to secure any work in the music industry since her termination, including losing a highly lucrative

recording deals, because of the damage to his reputation and/or the real fear of retaliation by Defendant Diddy or his affiliated businesses.

1002.    Defendant Diddy's actions, false statements and intentional interference have further proximately caused Plaintiff to suffer shame and disgrace and she has suffered and continues to suffer severe emotional distress from having her highly successful career in the music industry destroyed by a malicious and reckless smear campaign orchestrated by Defendant Diddy.

1003.    The actions of Defendant Diddy were done with malice, fraud or oppression, and in reckless disregard of the Plaintiff's reputation and need to earn a living, and Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

## <u>FINAL PRAYER FOR RELIEF</u>

**WHEREFORE,** Plaintiff respectfully requests a judgment against the Defendants that:

- Declares Defendant Diddy engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that Defendant Diddy harassed, assaulted and battered Plaintiff;

- Declares that Defendants BBE, Bad Boy Records, Combs Enterprises, UMG, UMG Distribution, SJC, BM, MTV, Viacom, Paramount, JCP, JCPH engaged in unlawful practices prohibited by the New York City Victims of Gender-Motivated Violence Protection Act, in that they enabled Defendant Diddy's commission of the crimes of violence motivated by gender;

- Awards Plaintiff compensatory damages for mental, and emotional injury, distress, pain and suffering and injury to her reputation, consequential damages, lost wages, earning,

and all other sums of money, together with interest on these amounts in an amount to be proven;

- Awards Plaintiff damages against Defendants joint and severally;

- Awards lost wages and other monetary relief in an amount according to proof;

- Awards compensatory damages, including general and special damages in an amount according to proof, but in the event of default, not less than $20,000,000;

- Awards Plaintiff punitive and exemplary damages according to proof; but in the event of default, not less than $40,000,000;

- Awards Plaintiff attorneys' fees, costs, and expenses incurred in the pursuance of this action;

- Awards interest on the sum of damages awarded, prejudgment and post-judgment interest; and

- Awards Plaintiff such other and further relief as the Court may deem equitable and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein, so triable, pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Respectfully Submitted,

Dated: February 28, 2025                    By:/s/ Ariel E. Mitchell, Esq.
                                            Ariel E. Mitchell, Esq.
                                            **The Law Office of Ariel E. Mitchell, P.A.**
                                            500 NW 2nd Ave. #12864

Miami, FL 33103
305-903-5835
ariel@arielesq.com
*Attorney for Plaintiff*
(Pro Hac Vice Application Pending)

By: /s/ Steven A. Metcalf, II, Esq.
Steven A. Metcalf, II, Esq.
**METCALF & METCALF**
99 Park Ave., Suite 810
New York, NY 10016
646-253-0514
*Attorney for Plaintiff*
(Co-counsel/local counsel)